# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| PREVENT USA CORPORATION; and EASTERN HORIZON GROUP NETHERLANDS B.V. | Civil Case No._____ |
| Plaintiffs, | ***JURY TRIAL DEMANDED*** |
| v. | Judge:_____ |
| VOLKSWAGEN, AG; and VOLKSWAGEN GROUP OF AMERICA, INCORPORATED, | |
| Defendants. | |

## **COMPLAINT**

# TABLE OF CONTENTS

I.      INTRODUCTION ....................................................................................4

II.     VENUE AND JURISDICTION ...............................................................10

III.    PARTIES .................................................................................................13

    A.      The Prevent Group ........................................................................13

    B.      Volkswagen ...................................................................................14

IV.     THE MARKET FOR AUTOMOTIVE COMPONENT PARTS .................15

    A.      The Relevant Product Market ........................................................15

    B.      The Relevant Supply Chain...........................................................16

        1.      Tier 3 Suppliers ...................................................................17

        2.      Tier 2 Suppliers ...................................................................17

        3.      Tier 1 Suppliers ...................................................................18

        4.      OEMs ...................................................................................18

    C.      Volkswagen's Market Power Over Suppliers ....................................19

        1.      Switching Costs, Supplier Lock-In, and Barriers to Entry .......21

        2.      High Information Costs.........................................................23

        3.      Volkswagen's Abuse of Market Power Over Small Suppliers.24

V.      VOLKSWAGEN'S RELATIONSHIP WITH PREVENT ...........................28

    A.      The Companies Enjoy an Amicable Supply Relationship While
        Prevent Remains Small and Compliant...............................................28

    B.      Prevent Begins Acquiring Struggling Suppliers, Threatening
        Volkswagen's Market Power ..............................................................29

C.	Volkswagen's "Dieselgate" Scandal Makes it Desperate to Cut Costs .............................................................................31

D.	Prevent's Acquisition of Car Trim Is the "Last Straw" for Volkswagen .........................................................................33

E.	In Retaliation for Car Trim, and to Suppress any Challenge to its Market Power, Volkswagen Launches "Project 1," an Anticompetitive Campaign to Block Further Supplier Acquisitions ...........................35

VI.	VOLKSWAGEN'S TORTIOUS AND ANTICOMPETITIVE CONDUCT ...........................................................................................39

A.	Volkswagen First Deploys its Acquisition Interference Scheme Against Prevent in Europe to Block At Least Two Acquisitions .......40

B.	Volkswagen Undertakes a Campaign to Block the Prevent Group from Acquiring Suppliers Based in the United States ......................43

C.	Through an Explicit, Written Agreement, Volkswagen Conspires with Tower to Stop an Acquisition by Prevent ...........................................48

D.	It is Plausible to Infer that Volkswagen Executed Similar Agreements with Other Target Companies based in the United States .................52

VII.	HARM SUFFERED BY PREVENT FROM VOLKSWAGEN'S MISCONDUCT ................................................................................54

VIII.	LEGAL CLAIMS FOR RELIEF ...................................................58

IX.	REQUEST FOR RELIEF .............................................................73

X.	JURY DEMAND ........................................................................74

Prevent USA Corporation and Eastern Horizon Group Netherlands B.V. (collectively, "Prevent" or the "Prevent Group") file this Complaint under the antitrust laws of the United States and the State laws of Michigan against Volkswagen AG and Volkswagen Group of America, Inc. (collectively, "Volkswagen"), and allege the following:

## I.   <u>INTRODUCTION</u>

1.      This is a case about anticompetitive and tortious tactics used by Volkswagen, the largest carmaker in the world, to maintain its stranglehold over suppliers of automotive component parts.  Volkswagen's business model depends on keeping its lower tier suppliers small and weak.  The Plaintiff in this case is the Prevent Group—an international supplier with a subsidiary registered in this District—that finally stood up to Volkswagen and presented a direct challenge to its business model.  It did so through a strategy to acquire smaller, distressed suppliers and thereby create a procompetitive check on Volkswagen's market power.  In response, Volkswagen undertook an anticompetitive campaign to block any such acquisitions, including by extracting written agreements from suppliers not to sell themselves to Prevent Group.  This strategy was carried out with the purpose and effect of suppressing competition, maintaining Volkswagen's market power over suppliers, and in the process causing massive losses to Prevent.  Prevent brings this action to recover for that damage.

2.     The world of carmaker-supplier relations is notoriously rife with opportunities for abuse.  Like most major carmakers, Volkswagen buys parts for its vehicles from a network of suppliers across the world.  Volkswagen's profits depend in large part on keeping its lower tier suppliers small, fragmented, and often on the brink of insolvency.  Because of high switching costs, substantial capital expenditures, and limited information, these smaller suppliers must "comply or die" when faced with Volkswagen's anticompetitive terms and prices.  Volkswagen works carefully to maintain this dynamic and acts quickly to stop any supplier from amassing the scale and bargaining power that might threaten Volkswagen's market dominance.

3.     Plaintiff Prevent Group began in the nineties as a small, family-owned supplier of leather trim and seating components for automobiles.  By the 2010s, the Prevent Group had grown to be a significant supplier of Volkswagen parts, including through acquisitions of smaller, distressed suppliers that lacked the liquidity to keep operating in the face of Volkswagen's aggressive terms and prices.

4.     As it grew larger and acquired smaller, failing suppliers, the Prevent Group amassed the power to resist Volkswagen's dominance and insist on competitive terms and prices.  This struck at the core of Volkswagen's dominance over suppliers:  If a supplier like Prevent were to grow big enough to resist

Volkswagen, not only would it be able to insist on better terms and prices, but other suppliers might follow suit.  Volkswagen therefore needed to stop procompetitive consolidation in its tracks, stop any acquisitions by Prevent in particular, and send a message to the rest of the automotive supplier industry.

5.      This all came to a head in the midst of Volkswagen's infamous "Dieselgate" scandal, when it was revealed that Volkswagen had deliberately manipulated emission testing for its so-called "clean diesel" vehicles.  Rocked by scandal, and facing billions of dollars in fines and penalties, Volkswagen was desperate to maintain its market dominance over suppliers and stop the growing, procompetitive forces being asserted by the Prevent Group.

6.      Volkswagen resorted to a series of tactics that were shocking in their audacity and disregard for the law.  At the highest levels of the company, Volkswagen executed an organized, institutional response with a single goal: identify and arrest any M&A activity among lower tier suppliers that would threaten Volkswagen's market power.  The Prevent Group was at the heart of this strategy, given its recent growth through the acquisition of failing suppliers.

7.      Dubbed internally "Project 1," the strategy was clear about the threat that Prevent posed to Volkswagen's market power.  An internal Volkswagen presentation observed that Prevent was "***continuing to actively exert pressure on Volkswagen through further takeovers!***"  According to the company's internal

presentations, Prevent's acquisitions of weak suppliers created "increased risk potential" for Volkswagen, including "***negative purchase prices***."

8.      The internal presentations also outlined Volkswagen's response:  The company would begin "scouring the supplier portfolio" for additional "small to mid-size suppliers with high dependency potential," try "to get visibility on potential sales", and then "***[i]nfluence consequently the M&A activities of global players***."  In other words, Volkswagen would prey on weak suppliers—those with "high dependency" on Volkswagen—and use its power to stop them from being acquired by Prevent.  Volkswagen's internal Project 1 presentations, along with a comprehensive tracking spreadsheet that Volkswagen used to monitor M&A activity among suppliers, identified a number of U.S.-based suppliers as "increased risk" acquisition targets, including Visteon Corporation based in Van Buren Township, Michigan.

9.      The means of Volkswagen's campaign to stop procompetitive M&A activity included textbook violations of the U.S. antitrust laws.  Exerting its market power, Volkswagen extracted agreements from suppliers—***in writing***—promising Volkswagen that they would not sell themselves or their assets to any company in the Prevent Group.

10.      Volkswagen carried out the strategy on a global scale.  In 2017, Prevent sought to acquire Inter Groclin Auto ("Groclin"), a Polish supplier of

automotive seat covers, car seats, and other automotive upholstery.  Volkswagen quickly intervened.  On May 4, 2017, Volkswagen forced Groclin to execute an option contract requiring Groclin to notify Volkswagen of any potential sale, including the identity of the potential acquirer, and to give Volkswagen the right to purchase Groclin instead of the other acquirer.

11.    In another instance, Volkswagen blocked Prevent's attempts to acquire Grammer AG and its U.S. subsidiaries.  Volkswagen agreed with Grammer management to block Prevent's acquisition by threatening to stop doing business with Grammer.  Grammer management agreed to make a statement to shareholders condemning the deal, to stop communicating with Prevent, and to seek permission from Volkswagen before accepting any offer.

12.    Volkswagen's misconduct was carried out on U.S. soil, including in this District.  In 2016, Prevent sought to acquire the Brazilian operations of Tower International, Inc., a supplier headquartered in Livonia, Michigan.  Prevent's approaches to Tower's management in Michigan were rebuffed at every turn, with statements such as "Tower can not [*sic*] do a transaction with [Prevent]" and "***please ask the head of Purchasing for Volkswagen*** Brazil to advise us that they would have no issue if Tower Aruja [Brazil] were sold to your company."  Tower cited no other business reason for turning away the acquisition.

13.     Eventually, the truth came out.  In a conversation with a third-party advisor, the CFO for Tower's Americas operations admitted that Volkswagen made Tower "*agree in writing that [Tower] would not sell to a Prevent associated company*."  This is direct evidence of Volkswagen reaching into this District to negotiate and execute an anticompetitive agreement.  This direct evidence, along with the evidence of similar agreements with European suppliers and Volkswagen's internal Project 1 strategy, makes it plausible to infer that Volkswagen executed similar agreements with at least seven other Michigan-based suppliers, six of which are headquartered in this District, which Prevent sought to acquire but was unable to as a result of Volkswagen's conduct.

14.     As a result of Volkswagen's misconduct, Prevent has suffered massive losses that strike at the core of its business and threaten its future in this "grow-or-die" industry.  Prevent was prepared to deploy at least $300 million for the acquisition of U.S.-headquartered suppliers.  Based on anticipated synergies and its demonstrated ability to run those companies more efficiently, Prevent projected a net return of between $750 million and $1 billion from those acquisitions.  Now, as a result of Volkswagen's misconduct, the Prevent Group has been deprived of those opportunities and profits, and has suffered additional harm to its competitiveness, goodwill, and market capitalization.

15. Volkswagen's actions harmed not only Prevent, but also the competitive structure of the automotive component part supplier market, many of its submarkets, and ultimately consumers of passenger vehicles. If suppliers cannot obtain the scale and scope necessary to resist Volkswagen's dominance, then the market-wide response across suppliers will be to reduce output (that is, produce fewer parts) in the face of terms and prices that are below competitive levels. With fewer parts available, the quality of automotive component parts and automobiles suffers across carmakers. By thwarting acquisitions that would have created a procompetitive counterbalance to its market power, Volkswagen has harmed competition and U.S. consumers.

16. Accordingly, the Prevent Group brings this action against Volkswagen for treble damages under state and federal antitrust laws, and for civil conspiracy and tortious interference under the laws of Michigan.

## II. VENUE AND JURISDICTION

17. This Court has jurisdiction under 15 U.S.C. § 26, and 28 U.S.C. §§ 1331 and 1337. Prevent seeks relief under Section 1 of the Sherman Act, 15 U.S.C. § 1, Section 2 of the Sherman Act, 15 U.S.C. § 2, Section 4 of the Clayton Act, 15 U.S.C. § 15, and Section 16 of the Clayton Act, 15 U.S.C. § 26. Jurisdiction is also proper under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and the action is between citizens of different States

10

under 28 U.S.C. § 1332(a)(1), and between citizens of a State and citizens or subjects of a foreign state under 28 U.S.C. § 1332(a)(2).

18.     This Court has jurisdiction over the state law claims under 28 U.S.C. § 1367 because the state law claims are so related to the federal antitrust claims as to form part of the same case or controversy.

19.     Venue is proper in this District under 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C. § 1391.  Through Volkswagen Group of America, Volkswagen transacts business in the United States, including in this District.  Volkswagen maintains a corporate office in this District and makes vehicle sales to Volkswagen dealers located in this District.  Volkswagen's illegal conduct had a direct, substantial, and reasonably foreseeable effect on interstate commerce in the United States, including in this District.  These effects include:

(a)     Foreclosure of Prevent from supplying automotive component parts;

(b)     Artificial restriction of market output in the automotive component part market;

(c)     Artificially depressed prices in the automotive component part market; and

(d)     Artificial restriction of procompetitive acquisitions with Michigan-based companies.

20.     Volkswagen is subject to the personal jurisdiction of this Court because, as alleged in this Complaint:

(a)     Volkswagen transacts business, has continuous or systematic contacts with, or minimum contacts to, the United States and this District sufficient to satisfy due process;

(b)     Volkswagen entered into a conspiracy, and performed unlawful acts in furtherance of the conspiracy, in or from this District, including contacting, agreeing, and conspiring with the management of at least seven Michigan-based suppliers to block any procompetitive sale of those companies or their assets to Prevent, in violation of federal and state antitrust law, and state tort law;

(c)     Volkswagen is amenable to service of process under Federal Rule of Civil Procedure 4(k)(1)(A) and Michigan's long-arm statute, M.C.L. § 600.705, because, as alleged in this Complaint, Volkswagen transacted business in Michigan and contracted to provide services to be rendered or for materials to be furnished in the State, and did or caused an act to be done that resulted in an action for tort, and because Michigan's long-arm statute extends jurisdiction to the limits of due process and Volkswagen has sufficient minimum contacts with Michigan to satisfy due process; or

(d)     Based on the allegations in this Complaint, Volkswagen is subject to general and specific personal jurisdiction of this Court because it has

purposefully directed its contacts and conspiratorial conduct at the United States, including the forum state, and has purposefully availed itself of the laws of the United States.  As alleged, Volkswagen engaged in conspiratorial activities and anticompetitive conduct that it intended to have, and did have, direct, substantial, and reasonably foreseeable effects on commerce throughout the United States, including the forum state.

## III.   PARTIES

### A.   The Prevent Group

21.   Founded and owned by the Hastor Family, the Prevent Group is a network of companies that is engaged in the worldwide supply of various automotive component parts.

22.   Plaintiff Eastern Horizon Group Netherlands B.V. ("Eastern Horizon") is a corporation organized and existing under the laws of the Netherlands with its principal place of business in Amsterdam, the Netherlands. Eastern Horizon is a company owned by the Hastor Family within the network of Prevent Group companies and operates as a holding company for newly-acquired Prevent Group operating companies.

23.   Plaintiff Prevent USA Corporation is a company within the Prevent Group, formed specifically to facilitate potential acquisitions in the United States.

Prevent USA Corporation is organized and existing under the laws of Pennsylvania and is registered to do business in the state of Michigan.

### B.   Volkswagen

24.    Volkswagen AG, or the Volkswagen Group, is a corporation organized and existing under the laws of Germany with its principal place of business in Wolfsburg, Germany.

25.    Volkswagen Group of America Inc. is a limited liability company organized and existing under the laws of New Jersey with its principal place of business in Herndon, Virginia.  Volkswagen Group of America maintains twenty operational facilities across the United States, including a corporate office within this District in Auburn Hills, Michigan.  Volkswagen Group of America Inc. is a wholly-owned subsidiary of Volkswagen AG.  Through Volkswagen Group of America, Volkswagen AG, among other things, manufactures, distributes, and markets vehicles for sale in the United States.

26.    The Volkswagen Group is the largest manufacturer of passenger vehicles in the world by sales volume.  The Volkswagen Group markets passenger vehicles under several brands, including Audi, Bentley, Bugatti, Lamborghini, Porsche, SEAT, Škoda, and its namesake brand, Volkswagen.  In 2018, it had roughly 235.8 billion euro revenue (about $258.8 billion).

## IV.   THE MARKET FOR AUTOMOTIVE COMPONENT PARTS

### A.   The Relevant Product Market

27.    The average car has tens of thousands of individual component parts. As the Court is no doubt aware, large carmakers (known in the industry as "Original Equipment Manufacturers," or "OEMs"), for the most part, do not manufacture those parts themselves.  Instead, they source them from an array of automotive component part suppliers across the world.

28.    Automotive component parts are not to be confused with aftermarket automotive parts like replacement windshield wipers or spark plugs, for example, which are sold to consumers in retail outlets and can generally be used in cars manufactured by different OEMs.  Automotive component parts, by contrast, are generally made to the specifications of an OEM and are sold directly to those OEMs.

29.    The individual product markets relevant to this Complaint consists of the markets for the products manufactured by each of the suppliers that Prevent sought to acquire, including:

> (a)    Interior seat structures and seat components;
>
> (b)    Metal automotive body structures;
>
> (c)    Engine and transmission components;
>
> (d)    Interior electronics;

15

(e)    Plastic interior and exterior trim;

(f)    Air systems and fuel management systems; and

(g)    Control and structural system components.

30.    In internal documents, Volkswagen analyzes such products as distinct markets, including by analyzing competitors and respective market shares with respect to each product separately.  The relevant product markets are worldwide in geographic scope.  OEMs like Volkswagen purchase automotive component parts from suppliers across the world.  In response to a non-transitory change in terms and prices offered by a supplier, an OEM would switch to an alternative supplier in another country.  For example, in 2016, BMW switched its supply of seat covers from a South African supplier to a Prevent Group company in Bosnia and Herzegovina.  In 2013, Volkswagen switched from its supply of leather from a South American supplier to Prevent's tanneries in Europe.

**B.    The Relevant Supply Chain**

31.    The automotive manufacturing market is generally characterized by a tiered supply chain illustrated by the diagram below.



### 1.   <u>Tier 3 Suppliers</u>

32.   At the beginning of the supply chain are Tier 3 suppliers.  Tier 3 suppliers sell raw, or nearly raw, materials like metal, plastic, textiles, and leather.

### 2.   <u>Tier 2 Suppliers</u>

33.   Tier 3 suppliers sell those raw materials to Tier 2 suppliers.  Tier 2 suppliers use those materials to make component parts, although some Tier 2 suppliers are vertically integrated and themselves produce the necessary raw materials.  Tier 2 suppliers often specialize, focusing on manufacturing a particular part or class of parts.  A supplier of interior electronics, for example, is a Tier 2 supplier.  Tier 2 suppliers usually sell their goods solely to automotive companies.

34.   Tier 2 suppliers typically sell their components to Tier 1 suppliers.

35.   During the relevant time, Prevent was a Tier 2 supplier.

### 3.    Tier 1 Suppliers

36.    Tier 1 suppliers incorporate the Tier 2 component part into a larger or more complicated component or an assembly of multiple components.  Tier 1 suppliers then sell their component parts directly to OEMs.  Tier 1 suppliers specialize in automotive grade parts, often built to the specification of a particular OEM.  Suppliers of audio systems, for example, are Tier 1 suppliers.

37.    OEMs often negotiate purchase prices, quantities, and product specifications with Tier 1 suppliers several times over the duration of a contract.

38.    Volkswagen makes weekly or monthly orders to Tier 1 suppliers, who in turn order the necessary quantities from Tier 2 suppliers.

### 4.    OEMs

39.    OEMs are at the final level of the supply chain.  These end product manufacturers design, assemble, and market vehicles for sale to consumers. Volkswagen is an OEM.

40.    Although it purchases parts directly from Tier 1 suppliers, Volkswagen deals directly with suppliers at every level in the supply chain to source their specific component part.  In the interior seating market, for example, Volkswagen determines the permitted fabric and leather suppliers in the Tier 3 market, the seat warmer suppliers in the Tier 2 market, and the completed seat supplier in the Tier 1 market.  For each level, Volkswagen dealt directly with

suppliers, either through direct purchases or a directed supplier relationship in which Volkswagen specifies with a Tier 1 supplier the contractual terms that must be agreed to by specific Tier 2 or Tier 3 supplier as a condition of the Tier 1 contract.

41.    Volkswagen thus dictates suppliers, prices, product specifications, purchase volumes, and sales terms at every level in its supply chain.  Volkswagen refers to its multi-level involvement as "digging deep" into its supply chains.

### C.    Volkswagen's Market Power Over Suppliers

42.    Volkswagen has so-called "monopsony power" in the market for automotive component parts, including in the relevant product markets. Monopsony power exists when a buyer, rather than a seller, has power in the purchasing market sufficient to restrain competition, including the power to force a supplier to do something that the supplier would not do in a competitive market.

43.    Buyers with such monopsony power can restrict output and lower prices and terms below competitive levels.  In response to these suppressed prices and terms, suppliers must lower their output—that is, produce fewer components. With fewer units of various automotive component parts available, OEMs reduce the quality and increase the price of their end product (here, passenger vehicles), which harms end-consumers in the long run.

44.    These anticompetitive effects have long been recognized by courts and commentators:  "Such shortchanging poses competitive threats similar to those posed by conspiracies among buyers to fix prices . . . and other restraints that result in artificially depressed payments to suppliers—namely, suboptimal output, reduced quality, allocative inefficiencies, and (given the reductions in output) higher prices for consumers in the long run."  *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 103–04 (3d Cir. 2010) (holding that "when a firm exercises monopsony power pursuant to a conspiracy, its conduct is subject to more rigorous scrutiny and will be condemned if it imposes an unreasonable restraint of trade" (internal citations omitted)); *see also* Phillip E. Areeda (late) & Herbert Hovenkamp, *Antitrust Law:  An Analysis of Antitrust Principles and Their Application* ¶ 350b (4th ed. 2013–18) ("Clearly mistaken is the occasional court that thinks low buying prices procompetitive regardless of the restraints on competition that lead to such prices . . . .  The suppliers' loss also constitutes antitrust injury, for it reflects the rationale for condemning buying cartels—namely, suppression of competition among buyers, reduced upstream and downstream output, and distortion of prices.").

45.    This economic result occurs market-wide and may not be observable on a contract-by-contract basis, especially because OEMs enter requirements contracts that dictate quantity.  It also may be somewhat counterintuitive that

market power exerted to *reduce* prices could also result in harm to consumers.  But antitrust law and economics have long recognized that these abuses of market power over suppliers, when observed in the long-run, reduce output, harm competition, and ultimately harm consumers.  *See id.* at ¶ 575 ("The monopsonist, like the monopolist, 'exercises' its power by reducing output, in this case in the market in which it purchases."); *id.* at ¶ 1637 (noting, for example, that "[m]anufacturers with monopsony power . . . might use that power to force the dealer's markup to infracompetitive levels.  The result, as in all cases of monopsony, would be a reduced supply of dealership services."); *id.* at ¶ 2011 (noting that when a monopsonist also has market power in the resale market "the counterintuitive but nevertheless robust result is reduced output and *higher* prices in the resale market").

### 1. <u>Switching Costs, Supplier Lock-In, and Barriers to Entry</u>

46.     Here, structural elements of the automotive component part market make suppliers willing to accept terms they would not accept in a competitive market—that is, a market not dominated by a buyer with monopsony power.

47.     As vehicle complexity rises, and new vehicles rely on new and advanced technology, Volkswagen increasingly requires specialized, dedicated machinery to produce their components.  For the same reason, the capital cost required for a supplier to switch from producing one OEM's products to another

OEM's products is often prohibitively high, especially for smaller suppliers.  These costs may include specialized technical equipment like tools or machines, plants near the relevant OEM assembly plant all over the world, and licensing or otherwise obtaining intellectual property.  Prevent, for example, invested significant resources in warehouses in close proximity to Volkswagen's assembly plant in Wolfsburg, Germany.

48.     Second, suppliers are prevented from switching due to the substantial lead time and investment necessary to develop the technology and hardware required to produce a new OEM-specific component.  One industry publication explained that "suppliers are being asked to make substantial long-term investments in R&D to increase the share of value their component parts contribute to the mix.  But if they can't recover those investments because they are getting squeezed by OEMs, an imbalance will occur."[1]  Prevent, for example, invested roughly 20 million euros in machines that were suitable only for manufacturing Volkswagen's rear seat steel frames.

49.     The time between initial contracting and production can be several years.  The result is that "suppliers can't switch partners on a short notice because they lack the necessary agility" in their technology and operations.[2]

---

[1] Boris Felgendreher, *Why Are Global Supply Chains Becoming More Fragile?*, SUPPLY CHAIN DIGITAL, Oct. 31, 2016 (last accessed Nov. 8, 2019).  *See* Exhibit 1.
[2] *Id.*

50.     As a result, suppliers are highly or solely dependent on a single OEM like Volkswagen.

## 2.     High Information Costs

51.     Suppliers also face high information costs.  OEMs like Volkswagen typically order parts on a "just-in-time" basis, meaning Volkswagen only orders parts when it needs them, often with short notice to the supplier.

52.     This means that, at the time of original contracting with the OEM, a supplier cannot predict the quantity requirements of the OEM or the price of those orders.

53.     When the supplier invests significant capital in dedicated tooling, plants near the OEM assembly plant, or other OEM-specific investments, the supplier is therefore unaware of the price or quantity of the OEM-specific goods, and unaware how long the OEM will demand those goods.  Timing can only be estimated, and volumes are uncertain.  The supplier thus lacks the information to assess post-investment prices and quantity demands.  This relevant information is either unavailable to the supplier or the cost of obtaining it is prohibitively high.

54.     Suppliers are therefore given no indication that an OEM might dramatically decrease the quantity or the price after the supplier makes OEM-specific investments.

### 3.   Volkswagen's Abuse of Market Power Over Small Suppliers

55.     Volkswagen's market power depends in large part on its ability to maintain a diverse, fragmented group of small Tier 2 and Tier 3 suppliers.  This behavior differentiates Volkswagen from other OEMs, which depend much more on large Tier 1 suppliers and do not "dig that deep" into the supply chain to control Tier 2 and Tier 3 suppliers.

56.     The manufacture of automotive component parts requires significant financial liquidity to manage capital-intensive operations and long lead times.  This means that, without substantial size and scale, suppliers often encounter financial distress and can teeter on the brink of insolvency.

57.     So long as this dynamic persisted, Volkswagen could exercise market power over lower-tier suppliers and force them to accept prices and terms below competitive levels.  For many lower-tier suppliers, the choice was simple:  Moving to another OEM would mean immediate insolvency due to the high switching costs, while accepting Volkswagen's terms would allow them to survive, at least in the short term.  One member of an automotive supplier organization described the problem as the choice of "mid-term 'death for sure' or a short term 'death immediately.'"  This comply-or-die predicament was central to Volkswagen's exercise of market dominance.

58.     Volkswagen exploited this power to impose five principal types of anticompetitive terms.

59.     *First*, Volkswagen required struggling suppliers, which were heavily reliant on Volkswagen's business, to sell finished components at prices below the suppliers' cost of production, and in some instances below the price those manufacturers paid for the raw materials.  Those suppliers effectively subsidized every component part sold to Volkswagen.

60.     For example, before Prevent acquired Rioglass, a French automotive glass supplier, Volkswagen required Rioglass to sell components at a price below the cost of raw materials.  This period of infracompetitive pricing persisted for about two and a half years, including after price renegotiations, without Rioglass switching production capacity to a different OEM.  In another example, before Prevent acquired Car Trim, Car Trim's contract prices and terms with Volkswagen forced Car Trim to operate at a loss.  This period of infracompetitive pricing continued for at least a year, during which Volkswagen required additional price cuts.  The same was true for Eybl Austria before it was acquired by Prevent. Volkswagen required Eybl Austria accept prices below the cost of making the finished component.  These infracompetitive prices were often exacerbated by required annual price cuts, which Volkswagen successfully imposed on its suppliers.

25

61.     *Second*, Volkswagen conditioned continued business on suppliers making certain technical product changes.  For example, Volkswagen would issue a demand to the supplier that it manufacture certain portions of a seat using lower quality leather.  Within days of the demand, Volkswagen would lower the price it would pay for seats to reflect the lower-cost product.  Volkswagen then refused to purchase already-produced unchanged goods at the original agreed upon price.  The effect of this conduct was to artificially lower the price of the component parts.

62.     In other instances, Volkswagen would require a charge that increased the material cost of the part while forcing the supplier to bear those increased costs.  Volkswagen would issue a demand for the product change—for thicker steel, for example.  Then suppliers manufactured the more costly products, but Volkswagen would refuse to pay a higher price for the higher-quality parts, forcing suppliers to bear the full cost of the improvement.  The effect of this behavior is to artificially lower the price of the improved goods.

63.     *Third*, Volkswagen calculated the price it would pay using a method that systematically drove prices below competitive levels.  This method, used in Volkswagen Requests for Quotes ("RFQs"), did not include the depreciation cost of plants and equipment, the cost of modifying a plant to meet the technical demands of Volkswagen, or various unanticipated labor costs.  The calculation

method did not include, for example, indemnity for suppliers for the costs of winding down a plant when Volkswagen unexpectedly cancelled or dramatically reduced its demand.  Although the RFQ calculation typically was modeled on a 3% "profit" for suppliers, this margin was quickly eroded by these additional costs for which suppliers bore all the risk.

64.     *Fourth*, Volkswagen required suppliers to pay what it called "Quick Savings," which are large upfront payments suppliers must pay to be awarded a new Volkswagen contract.  These upfront payments were not included in Volkswagen's RFQ, meaning the supplier did not recoup the cost of the payment during the contract period.  One German researcher discussed this business practice, noting that "[t]he motor vehicle industry is especially prone to corruption because of business practices that encourage suppliers to put up large sums to win contracts . . . ."[3]

65.     *Fifth*, Volkswagen required suppliers to enter multi-year contracts under which Volkswagen required suppliers to make annual 3% price cuts, without considering inflation or increased cost of materials.  This pricing strategy, which Volkswagen calls "Global Sourcing," is used to artificially reduce the purchase price for component parts.

---

[3] JUST AUTO, *Germany: Auto Industry Particularly Prone to Corruption*, July 27, 2006 (last accessed Nov. 8, 2019).  *See* Exhibit 1.

66.     Volkswagen was able to achieve these infracompetitive prices and terms across its supplier base, including in the relevant product markets.  The effect of these prices and terms was to drive the price of automotive component parts below levels that would exist in a competitive market.

67.     All of this establishes Volkswagen's durable ability to impose prices and terms that suppliers would not accept in a competitive market—a hallmark of market power.

## V.     VOLKSWAGEN'S RELATIONSHIP WITH PREVENT

### A.     The Companies Enjoy an Amicable Supply Relationship While Prevent Remains Small and Compliant

68.     At its inception in the early 1990s, Prevent's small manufacturing business largely involved cutting and sewing leather and textile seat covers.

69.     In the early 2000s, Volkswagen began using Prevent component parts. This was at a time when Volkswagen was beginning to outsource large parts of its own production to numerous suppliers.  By the 2010s, Prevent was responsible for about 70% of the seat covers in Volkswagen brand vehicles manufactured in Europe, and Prevent was annually supplying Volkswagen with its components for use in more than six million vehicles.

70.     At the time, Prevent was a mid-size supplier heavily dependent on Volkswagen's business.  Using its power over the entire Prevent Group as leverage, Volkswagen frequently required Prevent to make price reductions.

Prevent accommodated these price reductions, hoping to increase Volkswagen's loyalty to its brand.

71.     Volkswagen Group purchased Prevent component parts for incorporation in several of its passenger vehicles:  Golf A7, Audi Q3, Passat (B7 and B8) and Audi A1.  Volkswagen Group assembled these vehicles, which incorporated Prevent component parts, in Europe and sold them in the United States through Volkswagen Group of America.

72.      Recognizing Prevent's operational performance, high quality, and low margins, Volkswagen awarded Prevent several "Supplier of the Year" awards.

## B.     Prevent Begins Acquiring Struggling Suppliers, Threatening Volkswagen's Market Power

73.     This positive relationship continued until Prevent began a growth and diversification strategy that directly jeopardized Volkswagen's ability to maintain and exploit its market power:  the acquisition of distressed and underperforming suppliers.  These acquisitions both expanded Prevent's product line and allowed Prevent to produce interior components more efficiently by vertically integrating[4] into certain Tier 1 and Tier 3 segments of the supply chain.

---

[4] "Vertical integration can produce significant cost reductions by enabling the integrating firm to achieve two kinds of efficiencies.  'Production' efficiencies refer to savings in the cost of producing or distributing a good.  'Transactional' efficiencies refer to cost reductions that result from the firm's avoidance of the marketplace, with its attendant costs and risks."  Phillip E. Areeda (late) & Herbert Hovenkamp, *Antitrust Law:  An Analysis of Antitrust Principles and Their Application* ¶ 757 (4th ed. 2013–18).

74.     Prevent acquired nearly two dozen automotive suppliers.  These acquisitions included Austrian interior parts supplier Eybl Austria GmbH, with plants in Austria, Hungary, Romania and Slovakia in 2008 and 2009, French automotive glass supplier Rioglass S.A. in 2009, German seat structure supplier TWB GmbH & Co. KG in 2010, Austrian leather supplier Lederfabrik Vogl in 2011, and German cast iron gearbox supplier ES Automobilguss in 2015.

75.     At the time of Prevent's acquisitions, suppliers faced increased financial difficulty from relentless cost pressure from Volkswagen that brought many to the brink of insolvency.  Without an acquisition, those suppliers could not have continued to operate.

76.     During this period of growth, Prevent was known among suppliers and across the automotive industry for its track record of turning around underperforming or failing suppliers.  Prevent developed highly effective restructuring techniques, streamlined manufacturing, and leveraged existing competencies and relationships into new segments of the market.

77.     Prevent also grew organically through investments in certain Tier 3 supply chain segments.  In 2006, for example, Prevent built a leather tannery in Bosnia and Herzegovina to supply its own high-quality, low-cost leather for use in its interior leather components.

### C.     Volkswagen's "Dieselgate" Scandal Makes it Desperate to Cut Costs

78.     Although Volkswagen had long used these tactics to control its suppliers, its motivation and intensity increased in late 2015.

79.     On September 18, 2015, the United States Environmental Protection Agency issued a notice to Volkswagen accusing the carmaker of using "defeat devices" in its diesel vehicles.  The defeat device could recognize when regulators were testing the diesel vehicle for compliance with emission standards.  The defeat device then artificially increased pollution controls to falsely indicate to regulators that the vehicle passed regulatory muster.

80.     For the year before the EPA notice, throughout 2014, Volkswagen had insisted that the discrepancies resulted from technical error.  But after over a year of lying to regulators, Volkswagen admitted that it had installed the defeat devices to conceal the true emissions of 11 million cars worldwide.  Following the EPA revelations, at least ten government authorities opened investigations into Volkswagen.

81.     In early 2018, the New York Times revealed that Volkswagen helped fund at least two studies in 2014 designed to rebut a finding by the World Health Organization that diesel emissions could cause cancer.  In one study, 25 people were exposed to varying levels of diesel gas over several hours.  The study tested "nitrogen dioxide inhalation by healthy people."  In the second study, researchers

placed ten monkeys in airtight chambers and forced the monkeys to inhale fumes from a diesel Volkswagen Beetle.  The Beetle was fitted with the defeat device.

82.     According to documents made public in July 2019, vehicles fitted with defeat devices, some of which were brand new, were on the road as late as December 2017.  In September 2019, German prosecutors announced charges against Volkswagen's two high-ranking executives for failing to inform shareholders of the EPA investigation that led to Volkswagen's conviction for emissions cheating.

83.     The total cost of the scandal is estimated be as much as 35 billion euros (about $38.7 billion).  In June 2016, Volkswagen agreed to pay $15.5 billion to settle various public and private lawsuits in the United States, the largest settlement of an automobile class action in U.S. history.

84.     Volkswagen was in crisis following Dieselgate.  During the three days of trading after the EPA notice became public, Volkswagen's stock price dropped 42.5%.  A year later, in September 2016, Volkswagen's stock price was still down 30%.  To survive, Volkswagen had to drastically cut costs to both pay the enormous fines and to invest in electric cars and other green technology to rebuild its image.  To do so, Volkswagen announced an effort to reduce annual spending by one billion euros (about $1.13 billion).

85.     Supplier relationships were a major focus of this cost-cutting. Ferdinand Dudenhoeffer, director of the Center for Automotive Research at the University of Duisburg-Essen explained why driving supplier costs below competitive levels was an attractive option for Volkswagen.  "Sinking purchasing costs at the Volkswagen [G]roup just 1 percent would boost profit by about 1.5 billion euros."   In the month after its record Dieselgate fine, Volkswagen's head of procurement Francisco Javier Garcia Sanz sent a letter to suppliers warning them of new cost cutting efforts, saying Volkswagen faced "epochal change driven by new technologies and customer requirements."

### D.     Prevent's Acquisition of Car Trim Is the "Last Straw" for Volkswagen

86.     In April 2016, with Volkswagen mired in scandal, Prevent continued to pursue its acquisition strategy through the purchase of Car Trim, a German Tier 2 supplier of leather seat covers, interior components, and complete seats.

87.     Before the acquisition, Car Trim had at least two running contracts and two future contracts with Volkswagen that had been executed in late 2015. Under the two future contracts, Car Trim would perform cutting and sewing services for two Volkswagen Group vehicles, the Volkswagen Touareg and the Porsche Cayenne, with delivery starting in 2017 and 2018, respectively.  Under the terms of the running contracts, Volkswagen imposed prices and terms that caused Car Trim to operate at a loss.

88.     When Volkswagen and Car Trim contracted for those goods in 2015, Car Trim was financially distressed and highly dependent on Volkswagen as its only large OEM customer.  Car Trim faced the comply-or-die decision:  Without the deal, Car Trim would be insolvent.  But with the deal, Car Trim had a chance to survive long enough to complete the Volkswagen contracts.  Car Trim accepted.

89.     In April 2016, it was announced that Prevent was acquiring Car Trim. Prevent's acquisition of Car Trim allowed Prevent to maintain the productive capacity of Car Trim, increasing the overall output of automotive interior seat components.  The acquisition also allowed Prevent to take advantage of productive efficiencies by integrating Car Trim's complementary manufacturing assets.

90.     Before Prevent's acquisition of Car Trim, Volkswagen was set to benefit mightily from its two contracts with Car Trim.  But as Volkswagen feared, Prevent's acquisition transformed Car Trim from a compliant participant in Volkswagen's abuse of market power into a company with enough bargaining power to resist it.

91.     Volkswagen responded immediately.  Within two months of the acquisition, on June 28, 2016, Volkswagen cancelled the two new contracts with Car Trim—now a wholly-owned subsidiary of Prevent—on one-day's notice.

E.      **In Retaliation for Car Trim, and to Suppress any Challenge to its Market Power, Volkswagen Launches "Project 1," an Anticompetitive Campaign to Block Further Supplier Acquisitions**

92.     For Volkswagen, the Car Trim acquisition proved that consolidation among lower-tier suppliers represented the biggest threat to the carmaker's ability to control its supply chain, particularly Tier 2 and Tier 3 suppliers.  If a supplier like Prevent could stand up to Volkswagen's unfair practices and acquire similar small, distressed suppliers, without the prior consent of Volkswagen, then Volkswagen could no longer force its suppliers to accept terms and prices below competitive levels.  And this risk was especially acute at a time when Volkswagen was dealing with the fallout of the Dieselgate scandal.  The European press described the standoff as a "David versus Goliath" story that represented a potential change in the power dynamics of OEMs and their supply chains.

93.     Volkswagen addressed this threat with an organized, methodical, and institutional response.  At the highest levels of the Volkswagen Group, Volkswagen internally unveiled "Project 1,"[5] a strategy designed to stop stronger suppliers—and Prevent specifically—from threatening Volkswagen's market power by acquiring smaller distressed suppliers.  Project 1 was highly confidential.

---

[5] The source for the internal Volkswagen documents referenced herein, including the Project 1 documents, is a senior Volkswagen executive with first-hand knowledge of the internal documents and events alleged herein and whose identity has been concealed to protect against retaliation by the Company.  Quotes of written Volkswagen materials throughout the Complaint are unofficial translations from German.

Members of the group were told to destroy documents and communications related to the scheme.

94. Project 1 had both a short-term and a long term component. *First*, Volkswagen would wreak havoc on Prevent's liquidity and short-term viability by cancelling all existing contracts with Prevent and its subsidiaries. At the same time, Volkswagen would mislead Prevent about their future supply relationship so Prevent would not have time to find alternative business.

95. *Second*, Volkswagen would ensure that its suppliers, especially its Tier 2 and Tier 3 suppliers, remained small, fragmented and vulnerable to Volkswagen's market power by putting a stop to any further acquisitions by suppliers like Prevent.

96. Volkswagen's anticompetitive goal is apparent from its internal meetings about Project 1. In internal slide presentations, Volkswagen outlined the factors in a supplier acquisition that would give rise to "increased risk potential" for Volkswagen. These included, as admitted in Volkswagen's documents, "***negative purchase prices***." The documents also flagged the risk of consolidation among suppliers with high reliance on Volkswagen and long transfer times to switch to another supplier—in other words, the suppliers most vulnerable to Volkswagen's market power. Prevent, in particular, Volkswagen representatives

warned, "*continue[d] to actively exert pressure on Volkswagen through further takeovers!*"

97.     The presentations further summarized Volkswagen's goals of "scouring the supplier portfolio" for additional "*small to mid-size suppliers with high dependency potential*," implementing pre-acquisition options in contracts with suppliers that include the right to refuse acquisitions for "quality issues," checking existing "pre-purchase options to get visibility into potential sales," and "*[i]nfluenc[ing] consequently the M&A activities of global players*."

98.     As part of these efforts, Volkswagen maintained an expansive internal spreadsheet that carefully tracked the financial health of suppliers in every level of its supply chain.  This spreadsheet—referred to internally at Volkswagen as "the "*Problematic Suppliers List*" or the "Watch List" (hereinafter, the "List")—included external financial ratings for each supplier, each supplier's reliance on Volkswagen by percentage of sales, a "depth rating" for each supplier, and Volkswagen's plans for dealing with the supplier.  In the "status" column, Volkswagen recorded any information on change of control, including whether a potential purchaser had signed a Letter of Intent to purchase the supplier, and the identities of potential acquirers.

99.     In a row for Finoba Auto, for example, Volkswagen lists the following information:  Finoba sells 65% of its volume to Volkswagen; Finoba is

included on the list because "core business not profitable, high debt, high dependency, Chinese has taken stakes"; "[t]alks between the managing shareholder and Völkswagen took place"; and as next steps, "[p]ossibly Change of Control and standard monitoring."

100.   The List is evidence that Volkswagen regularly entered "Letter of Comfort" agreements with failing suppliers to block takeover attempts.  For example, in the row for one supplier noted as an acquisition risk, Alu Menziken Euromotive GmbH, Volkswagen writes as next steps: "Agreement of general LOC including information requirement or non-procurement recommendation." Another supplier, AD Plastik D.D., appears on the List with an entry (attributed to Volkswagen Risk Management) that "[d]ue to historical connections to Prevent we recommend placing on the watchlist."

101.   The Volkswagen entities and business divisions identified on the List as responsible for identifying and managing the relationships with the potential targets included Volkswagen Group of America.  Volkswagen Group of America contributed at least four suppliers to the List.  For example, the List says that for one supplier, FTE, Volkswagen Group of America is noted the "origin" of FTE's inclusion on the List, and FTE's risk rating is noted as "estimated by VWGoA."

102.   In March 2018, executing on its Project 1 strategy, Volkswagen abruptly cancelled all existing long term contracts with Prevent.  In total,

Volkswagen issued over a dozen cancellations, including for all existing contracts between Volkswagen and the following Prevent entities:  Prevent DEV GmbH, Prevent TWB GmbH & Co. KG, Eastern Horizon Group Netherlands B.V., Prevent Foamtec GmbH, ES Automobilguss GmbH, Car Trim GmbH, and Eybl Austria GmbH.

## VI.   VOLKSWAGEN'S TORTIOUS AND ANTICOMPETITIVE CONDUCT

103.   Armed with the lessons learned from Prevent's Car Trim acquisition, Volkswagen set out to execute the second part of Project 1:  blocking any further supplier acquisitions that might threaten its market power.

104.   The means of this conspiracy were flagrant and shockingly obvious. Demonstrating its market power, Volkswagen extracted agreements from suppliers—*in writing*—promising Volkswagen that the suppliers would not sell themselves or their assets to any company in the Prevent Group.

105.   Volkswagen carried out this scheme on an international scale.  On August 16, 2016, Sebastian Oliver, a Corporate Sourcing Analyst in the Volkswagen Interior Procurement division gave a presentation about the Volkswagen supplier base.  In the presentation, Oliver outlined Prevent acquisitions that would have "increased risk potential" for Volkswagen.  Oliver then identified specific "increased risk" acquisition targets.  These included certain

European-based suppliers, in addition to American companies such as Visteon

Corporation, which is headquartered in Van Buren Township, Michigan.

### A. Volkswagen First Deploys its Acquisition Interference Scheme Against Prevent in Europe to Block At Least Two Acquisitions

106.   Volkswagen blocked Prevent from acquiring suppliers or their

operations in several ways, including making misleading statements to the

acquisition targets' shareholders to induce the shareholders to reject Prevent's

offer, soliciting and securing alternative offers or buyers, contacting the acquisition

targets' other large customers to convince those customers to oppose the

transaction, directly lobbying shareholders and other directors to vote against or

otherwise block the transaction, and entering option agreements under which

Volkswagen could purchase the company in the event of an acquisition it did not

like.  Volkswagen even hired private investigators to investigate more than two

dozen Prevent executives.  On information and belief, Volkswagen did so in an

effort to gather more information about Prevent's potential takeover targets.

107.   Volkswagen used several of these tactics when Prevent sought to

acquire Grammer AG, a publicly listed German supplier of car seats, armrests, and

head rests, in 2016.  Grammer had significant operations in the United States,

which made it an attractive acquisition for Prevent.  Volkswagen had listed

Grammer as an "increased risk" acquisition and acted quickly to find a solution to

Prevent's impending acquisition.

108.   On August 16, 2016, the same day that Volkswagen executives discussed the "lessons learned" from Prevent's Car Trim acquisition, Ralf Brandstätter, a Volkswagen board member with responsibility for procurement, presented at a Volkswagen meeting.  In that presentation, Brandstätter discussed the actions necessary to prohibit Prevent from acquiring additional shares in Grammer.  At this point, Prevent had acquired about 10% of Grammer's shares.

109.    To block the acquisition, Brandstätter recommended contacting Grammer management and other Grammer shareholders to convince them to vote against Prevent's takeover attempt.  Brandstätter also recommended involving other Grammer customers in the scheme.

110.   Volkswagen then met with Grammer management to develop a plan to block Prevent's acquisition.  On September 19, 2016, a Volkswagen Board of Management member met with the CEO and Chairman of Grammer to discuss blocking the Prevent acquisition.  On Volkswagen's instruction, the Grammer CEO agreed not to communicate any more with Prevent.  The parties also agreed that Grammer would discuss all actions related to finding an alternative customer with Volkswagen before acting.

111.   On September 22, 2016, Volkswagen prepared a summary for the Board of Management explaining why blocking Prevent's acquisition of Grammer was essential.  Grammer was highly dependent on Volkswagen.  Volkswagen

41

included Grammer on its Problematic Suppliers List.  Volkswagen described the

reason for Grammer's inclusion on the List as "[e]ntry of Prevent as single largest

shareholder."  The status column reads: "Several discussions with Grammer

executive board and Grammer specialist departments, **_no new contracts without_**

**_protection against a takeover by Prevent_**."

112.   On January 11, 2017, a Volkswagen status report shows some of the

specific steps that it took to interfere with the acquisition.  These included inducing

the Grammer board to make an announcement that Grammer would not receive

business from "bigger customers" if the shareholders agreed to Prevent's

acquisition attempt.  At the time of the Grammer board meeting, the Volkswagen

report indicates that the statement was "in progress."

113.   In May 2017, as a result of these tactics, Grammer shareholders voted

to back management and block Prevent's acquisition attempt.

114.   In another example, Prevent sought to acquire Inter Groclin Auto

("Groclin"), a Polish supplier of automotive seat covers, car seats, and other

automotive upholstery.  Volkswagen quickly intervened.  Like Grammer, Groclin

had been on Volkswagen's Problematic Suppliers List.  In the status column,

Volkswagen's wrote: "Agreement on the signing of an information **_agreement and_**

**_pre-emptive rights after became known that Groclin wants to sell automotive_**

**_business (Interested parties include Prevent)_**."  And in the "next steps" column,

Volkswagen wrote: "One-on-one strategy meeting on 28.02.17 between Groclin, Procurement and Risk Management is to define future forms of cohesion."

115.   A few months after that "strategy meeting," on May 4, 2017, Groclin entered an option contract with Volkswagen that gave Volkswagen the right to purchase Groclin if Groclin was acquired.  Under the contract, Volkswagen could either purchase Groclin itself or "appoint a third party to join the purchase agreement instead of the potential shareholder."  The contract gave Volkswagen ten working days to exercise the option from the date Groclin entered a final sales contract.

116.   The contract also required Groclin to notify Volkswagen of any potential sale, including the identity of the potential acquirer.

### B.   Volkswagen Undertakes a Campaign to Block the Prevent Group from Acquiring Suppliers Based in the United States

117.   In 2014, Prevent began to develop a strategy to use its experience and success acquiring distressed suppliers to acquire suppliers with headquarters in the United States.

118.   At the time, Prevent's product portfolio focused largely on interior component parts, including the interior leather components and automotive seats that had historically been the specialty of the brand.  But by this point, Prevent had also grown its product line to include other components.

119.   Prevent's U.S. acquisition strategy had two principal aims:  *first*, to strengthen its American presence by acquiring underperforming or distressed American suppliers within its existing product line; and *second*, to diversify by acquiring underperforming or distressed American suppliers of components outside its existing product line, including metal materials and components like break disks and engine components.

120.   Prevent had all the elements of a desirable acquirer for a struggling supplier, including:  experience in the component part market, a long track record of acquiring and turning around distressed suppliers, a strong financial footing, and existing relationships across the North American supply chain, including with Tier 1 suppliers like Johnson Controls, Lear, MAT, Magna, Sitech, and Faurecia.

121.   Prevent devoted substantial effort and resources towards this effort. Prevent invested in building relationships with U.S.-headquartered targets.  Prevent engaged investment banks to find potential U.S. targets.  Prevent hired an experienced American acquisition advisor to facilitate communication with potential targets and their investment banks.  Prevent sought to secure financing commitments to finance the acquisitions.  Prevent set up a dedicated office in New York City for the purpose of acquiring targets based in the United States.

122.   Under Prevent's American acquisition plan, Prevent was prepared to invest as much as $300 million over three years, with other expenditures contemplated after that time.

123.   For each of the potential acquisition targets, Prevent hired analysts and consultants to prepare detailed economic analysis with investment banks, assess the terms of a potential deal, and facilitate an acquisition.

124.   For a number of companies that Prevent was prepared to acquire, however, it turned out that these efforts would go to waste.  At least seven suppliers based in the United States that Prevent sought to acquire (the "Target Companies") were also on Volkswagen's Problematic Suppliers List.  These Target Companies were:

(a)     Tower International, a supplier of metal automotive body structures headquartered in Livonia, Michigan;

(b)     Hilite International, a supplier of engine and transmission components headquartered in Germany, with its North American Sales and Research and Development Center in Orion, Michigan;

(c)     Camaco-Amvian, a supplier of metal seat structures headquartered in Farmington Hills, Michigan;

(d)     Dura Automotive Systems, a suppliers of control and structural systems headquartered in Auburn Hills, Michigan;

(e)      Visteon, a supplier of interior electronics headquartered in Van Buren Charter Township, Michigan;

(f)      Key Plastics, a plastic interior and exterior trim suppliers headquartered in Livonia, Michigan; and

(g)      Mahle Industries, Inc., a supplier of air systems and fuel management systems headquartered in Farmington Hills, Michigan.

125.   All seven Target Companies appear on Volkswagen's List of Problematic Suppliers—that is, the List that Volkswagen used to track suppliers and ensure they were not acquired by a larger company like Prevent.

126.   In the row for Visteon, for example, Volkswagen writes that its reason for inclusion on the List is "showing signs of a possible sale in 2017."  Visteon's external economic rating is listed as "CCC," a notation indicating Visteon was highly financially distressed.  The "next step" for Volkswagen was to "[p]repare and agree an informational agreement."

127.   Volkswagen subjected each of the Target Companies to infracompetitive prices and terms, and each was highly financially distressed at the time of Prevent's attempted acquisition.  Dura Automotive Systems, for example, recently filed for Chapter 11 Bankruptcy.  Visteon had also previously filed for Chapter 11 bankruptcy.

128.   Each of these Target Companies had an existing relationship with Volkswagen, including selling automotive component parts to Volkswagen in the U.S. or other parts of the global market.

129.   Each of the Target Companies manufactured and sold automotive component parts in the United States to be incorporated by OEMs, including Volkswagen, in passenger vehicles manufactured and sold in the United States to United States consumers.  Each of the Target Companies is either a Tier 2 or Tier 3 supplier.

130.   Volkswagen deployed a variety of tactics to stop the acquisition of these Target Companies by stronger suppliers, and by Prevent in particular. Volkswagen pressured failing suppliers to take Prevent off their lists of potential acquirers, threatening that they would otherwise not have a future with Volkswagen as a customer.  Volkswagen also actively pressured merger and acquisition advisors.  When an advisor would consider Prevent as a potential acquirer, Volkswagen intervened to stop the sale.  In addition, a sale-side acquisition advisor asked other advisors to exempt Prevent representatives from any communication soliciting bids or advertising automotive targets.  On information and belief, these sale-side advisors were acting at the direction of Volkswagen.

131.   And, as detailed below, Volkswagen also resorted to extracting agreements from the Target Companies that explicitly prevented any sale of their business that might threaten Volkswagen.  Through these efforts, Volkswagen deliberately and repeatedly reached into the United States, and into Michigan in particular, to perpetrate its anticompetitive scheme.

## C.   Through an Explicit, Written Agreement, Volkswagen Conspires with Tower to Stop an Acquisition by Prevent

132.   In 2016, Prevent sought to acquire the Brazilian operations of Michigan-based Tower International, Inc. ("Tower").

133.   Tower manufactured metal automotive body structures and assemblies, including metal frames, chassis, and suspension components.  In April 2016, Tower publicly announced that it was selling its operations in Brazil and China.  Tower was struggling.  Its net income had dropped by 40% the year before.

134.   Volkswagen had included Tower on its List of Problematic Suppliers. In the "reason for inclusion" column, Volkswagen writes: "Sale of European and Brazilian business targeted, Tower Brasil, CZ and SK in deficit.  Sale of Europe canceled completely.  Sale Brazil in clearing."  In the status column, Volkswagen notes that "[c]onversation with Tower is done" and "[o]bligation to provide information as agreed for Tower Europe."   For next steps, Volkswagen says: "Clarification Procedure Brazil with Group and VW Brazil, feedback VW Brazil is pending."

135.   On May 19, 2016, a Prevent representative emailed Tower Americas CFO Phil Pfefferle[6] in response to Tower's public announcement of the sale. Almost instantly, however, Pfefferle responded that "Tower can not [*sic*] do a transaction with [Prevent]."  After additional back and forth, Prevent emailed an offer to Tower Director of Investor Relations Derek Fiebig.[7]  Prevent offered to purchase all Tower's Brazilian operations for 200 million Brazilian Real (about $48.6 million).

136.   Prevent also offered to issue a formal letter of intent to Tower. Prevent investors had approved the acquisition, secured financing, and hired an investment banker to facilitate the deal.

137.   It ultimately became clear, however, that Volkswagen was standing in the way of a potential acquisition by Prevent.

138.   On June 22, 2016, Tower CEO Mark Malcolm[8] responded to Prevent's offer.  Malcolm wrote:  "Volkswagen is the largest customer of Tower in Aruja [Brazil] and is also Tower's largest customer in Europe, so we cannot risk creating a problem.  If our understanding is correct, ***please ask the head of***

---

[6] Pfefferle worked out of Tower's Livonia, Michigan headquarters and resided in the greater Detroit area.

[7] Fiebig worked out of Tower's Livonia, Michigan headquarters.  He was responsible for Tower's interaction with shareholders, securities analysts, and investment banks.  He was also responsible for developing and executing Tower's strategy for selling assets.

[8] Malcolm worked out of Tower's Livonia, Michigan headquarters.  Mark Malcolm was replaced as CEO of Tower in January 2017.  Malcolm continued as a director of Tower from January 2017 to September 2019, when Tower was acquired.

***Purchasing for Volkswagen Brazil to advise us that they would have no issue if Tower Aruja [Brazil] were sold to your company***."   In a follow-up email the next day, Malcolm wrote "[i]f and when you are confident that Volkswagen Purchasing would support a possible acquisition of Tower Aruja [Brazil] by your company, ***please ask Volkswagen Purchasing to so advise Tower*** Brazil's President."

139.   In February 2017, a Prevent representative met with Tower's Brazilian Purchasing Manager, to discuss buying Tower's Brazilian business. According to an email account from a Prevent employee, during that meeting, on February 21, 2017, the Tower purchasing manager reported being told by Tower International management that "VW demanded that they [Tower International management] sign a document that informed of any sale to any interested party, specifically to Keiper [a Prevent entity], giving VW the right of option before selling the business."[9]

140.   Eventually, the full story came out.  In a conversation with a third-party advisor in 2019, the Tower Americas CFO, Phil Pfefferle, admitted that in negotiations with Volkswagen, "***I had to agree in writing that [Tower] would not sell to a Prevent associated company***."

141.   It is plausible to infer that the negotiations leading to this agreement were systematic and continuous from at least mid-2016 to early 2017, during the

---

[9] This quote is an unofficial translation from Portuguese.

time of Tower's potential sale of its Brazilian operations, and that the negotiations were carried out with Tower management from their headquarters in Livonia, Michigan.

142.   The purpose and effect of the agreement between Volkswagen and Tower was to foreclose any potential acquisition by Prevent of Tower's operations, which included operations in the United States, and operations that produced and sold automotive component parts in the United States for vehicles sold in the United States.

143.   On information and belief, Tower's failure to sell its Brazilian operations to Prevent significantly decreased shareholder value.  Prevent's acquisition would have maximized Tower shareholder value by offloading the distressed Brazil operations.

144.   On information and belief, Tower management never disclosed to its shareholders Prevent's offer, Volkswagen's interference, the history of negotiations between Prevent and Tower, or the communications between Volkswagen and Tower.  This information would have been material to a reasonable shareholder because, Prevent's offer was, at the time, the only offer management received in response to its public declaration of sale for the Brazil business.  Volkswagen caused Tower management to deprive its shareholders of the benefit of Prevent's acquisition.

**D.    It is Plausible to Infer that Volkswagen Executed Similar Agreements with Other Target Companies based in the United States**

145.    Based on the facts alleged in this Complaint and summarized below, it is plausible to infer that Volkswagen entered into similar agreements with the other Target Companies.

146.    *First*, Volkswagen's conduct with respect to Grammer, Groclin, and Tower demonstrate a pattern to block acquisitions that Volkswagen perceived as posing a procompetitive threat, including through express, written agreements. Both the written Groclin agreement and the written Grammer agreement came shortly after Prevent expressed an interest in acquiring those companies. Volkswagen acknowledged in its "Problematic Suppliers List" that it entered the agreements with Grammer and Groclin with the express purpose of blocking Prevent's acquisition attempt.

147.    *Second*, each of the Target Companies appears on Volkswagen's "Problematic Suppliers List," which it used to track weak, highly dependent suppliers, and to block possible acquisition attempts of those suppliers.

148.    *Third*, Prevent expressed interest in acquiring each of the Target Companies, including securing financing for the potential acquisitions and hiring investment banks to evaluate the acquisitions.  Each of the Target Companies were distressed or underperforming at the time of the attempted acquisition, and each

had a prior relationship with Volkswagen.  The Target Companies therefore fit the profile of "increased risk" acquisition targets with a "high dependency" on Volkswagen, as outlined in Volkswagen's Project 1 presentations.

149.   *Fourth*, Volkswagen's Project 1 outlined a deliberate strategy to stop Prevent from "continu[ing] to exert pressure on Volkswagen through further takeovers!"  Volkswagen also explicitly outlined its plan to use "pre-purchase option contracts to gain visibility into potential sales," which would include "change of control clauses" designed to stop acquisitions of suppliers such as the Target Companies that were small to mid-size suppliers with high dependency on Volkswagen.

150.   *Fifth*, Volkswagen actively pressured merger and acquisition advisors, including Morgan Stanley in the case of Grammer AG, not to contact or solicit bids from Prevent for failing automotive companies.

151.   *Sixth*, Volkswagen actively pressured distressed suppliers not to sell their companies to Prevent, threatening to stop doing business with the suppliers if they allowed Prevent's acquisition.

152.   Together, this conduct makes it plausible to infer that Volkswagen engaged in the same or similar anticompetitive conduct to stop Prevent from acquiring each of the Target Companies.

## VII.  HARM SUFFERED BY PREVENT FROM VOLKSWAGEN'S MISCONDUCT

153.   Volkswagen made out handsomely from the scheme.  Just two years after the Dieselgate scandal threatened to destroy it, Volkswagen was more profitable than before the scandal.  Financial analysts were perplexed at how this was possible.  One analyst from JP Morgan, José Asumendi, said:  "It's astonishing.  You wouldn't be able to recogni[z]e that they had gone through the diesel crisis."  The unexpected, and to some "impossible," returns came from "big cost cuts."

154.   By contrast, as a result of Volkswagen's misconduct, Prevent was blocked from conducting the acquisition strategy necessary to expand its business. In this "grow or die" industry, the effect on Prevent was disastrous:  Prevent's automotive business went from being worth over 1 billion euro (about $1.13 billion) to having serious liquidity problems that threaten its long-term viability.

155.   As demonstrated by the substantial resources that Prevent devoted to its acquisition strategy, in the absence of Volkswagen's interference and anticompetitive agreements with the Target Companies, Prevent would have acquired some or all of the Target Companies, or divisions of the Target Companies.  Each of the thwarted acquisitions would have increased productive efficiencies by allowing Prevent to capitalize on economies of scale and scope. The acquisitions would have increased the output in each of the relevant product

sub-markets by allowing Prevent to resist Volkswagen's infracompetitive price and supply terms.  In turn, the acquisitions would have allowed each of the Target Companies to remain financially viable competitors in their respective product sub-markets.

156.   All of the Target Companies manufacture and sell automotive component parts in the United States for incorporation in passenger vehicles manufactured and sold in the United States.  Volkswagen Group of America, under the direction of Volkswagen AG, purchased automotive component parts from the Target Companies and Prevent at artificially low prices.  Further, on information and belief, through Volkswagen Group of America, Volkswagen AG sold passenger vehicles in the United States that incorporated the affected automotive component parts.  Accordingly, by artificially restraining competition in the automotive component part market, and artificially reducing the output in that market, Volkswagen's anticompetitive actions had a direct, substantial, and reasonably foreseeable effect on United States commerce.

157.   As commentators have recognized, acquiring suppliers is necessary to maintain the bargaining power, geographic scope, and economies of scale required to remain in the automotive component part market.  Across industries, the top procurement tactic generating business value is consolidating volumes to increase negotiating powers.  This is because fewer suppliers with more volume means

shared investment in technology, capacity, and personnel are all possible areas for cost savings.

158.   But for the collusion between Volkswagen and the Target Companies, and Volkswagen's tortious interference with those business expectancies, Prevent would have increased efficiency and thus profitability across its business. Prevent's acquisitions of the Target Companies thus would have had a procompetitive[10] effect in each of the relevant product markets because:

(a)   The products produced by Prevent and the Target Companies are highly complementary, allowing Prevent to attain lower per-unit costs and greater specialization of both labor and machinery;

(b)   The distribution channels of Prevent and the Target Companies were highly similar, which would have facilitated economies of scale in distribution because downstream suppliers could more cheaply distribute the goods once bought separately from Prevent and the Target Companies;

(c)   Each of the Target Companies was distressed, underperforming, or had significant room for operational improvement, and Prevent's acquisition would have allowed the Target Companies' usable assets to remain productive, reassigning the productive assets from failing users to a successful user;

---

[10]   *See generally* Phillip E. Areeda (late) & Herbert Hovenkamp, *Antitrust Law:  An Analysis of Antitrust Principles and Their Application* ¶¶ 1105, 951–53 (4th ed. 2013–18).

(d)     Prevent's acquisition of the Target Companies would have precluded the administrative costs of bankruptcies; and

(e)     Prevent would have been able to realize research and development efficiencies because of both the diversity of its activities post-acquisition and its internal organization.

159.   Volkswagen's tortious and anticompetitive conduct has also caused Prevent to suffer substantial monetary damages.  Prevent made a series of internal projections based on the deployment of the $300 million in capital that Prevent had allocated toward its acquisition strategy.  Upon the successful deployment of that capital through acquisition of the Target Companies, Prevent projected a return of between $750 million and $1 billion over five to seven years.

160.   This conservative projection range was calculated using Prevent's past returns from acquired suppliers, Prevent management's projections for the returns from acquiring the Target Companies, and projections on the increased efficiencies, including economies of scale and scope, that Prevent would have achieved by adding one or more of the Target Companies to the Prevent portfolio.

161.   By blocking Prevent from acquiring the Target Companies, Volkswagen foreclosed Prevent from capturing these returns, caused loss to Prevent's industry goodwill and market reputation, and substantially decreased the overall market valuation of the Prevent Group.

## VIII.  LEGAL CLAIMS FOR RELIEF

### Claim 1:  Violation of Sherman Act § 1, Agreement in Restraint of Trade

162.   Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

163.   As alleged, Volkswagen has engaged and participated in one or more contracts, combinations, or conspiracies to artificially restrict competition for automotive component parts.  Volkswagen expressly agreed with Target Companies' management, including management of Tower, to block acquisition attempts by Prevent.

164.   Volkswagen's conduct violated, and continues to violate, Section 1 of the Sherman Act, 15 U.S.C. § 1, as an unreasonable restraint of trade.

165.   Volkswagen's conduct is per se unlawful under federal antitrust law. Alternatively, Volkswagen's conduct is an unreasonable restraint of trade under the rule of reason.

166.   The relevant market is the worldwide market for automotive component parts, including the product sub-markets for each of the automotive component parts manufactured by Prevent and the Target Companies.

167.   Volkswagen has market power in that relevant market, as directly evidenced by its sustained ability to impose terms and prices on its suppliers that are below competitive levels.

168.   Volkswagen has committed at least one overt act in furtherance of the conspiracy alleged in this Complaint.

169.   Volkswagen's actions as part of, and in furtherance of, its contracts, combinations, or conspiracies in restraint of trade were authorized, ordered, or done by one or more of Volkswagen's officers, agents, employees, or representatives while actively engaged in the management of Volkswagen's affairs.

170.   Volkswagen's anticompetitive acts had, and continue to have, substantial, unreasonable, and foreseeable effects on interstate commerce in the automotive component part market, including in each of the relevant product sub-markets.  These anticompetitive effects include:

(a)     Artificial suppression of competition in the market for automotive component parts;

(b)     Artificial reduction in market output and infracompetitive prices for automotive component parts; and

(c)     Artificial reduction in innovation and quality in the automotive component part supply market.

171.   Any competitive benefits from the conduct of Volkswagen and the Target Companies do not outweigh the actual and likely anticompetitive effects of

the agreements.  Any possible procompetitive benefits of the agreements with the Target Companies could have been achieved by less restrictive alternatives.

172.   Prevent was harmed, and continues to be harmed, as a result of Volkswagen's anticompetitive conduct.  Prevent suffered antitrust injury because:

(a)   Volkswagen subjected Prevent to below-competitive prices and terms for automotive component parts;

(b)   Volkswagen's anticompetitive agreements to block Prevent's procompetitive acquisitions foreclosed Prevent from the market for automotive component parts, including the relevant individual product sub-markets;

(c)   Volkswagen's anticompetitive agreements with the Target Companies to block Prevent's acquisitions decreased productive efficiency; and

(d)   Volkswagen conduct caused Prevent to reduce its automotive component part output.

173.   The injury to Prevent was a foreseeable consequence of Volkswagen's anticompetitive agreements with the Target Companies.

### Claim 2:  Violation of Sherman Act § 2, Monopsonization

174.   Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

175.   The relevant market is the worldwide automotive component part market, including the relevant product sub-markets.

176.   Volkswagen has monopsony market power in the market for the automotive component parts, including in each of the relevant individual product sub-markets.

177.   Volkswagen's monopsony power is not the consequence of a superior product, business acumen, or historical accident.  Instead, Volkswagen's monopsony power stems from its anticompetitive upstream control strategy, including its anticompetitive interference with supplier acquisitions, which unreasonably restrains trade.  Volkswagen therefore willfully acquired or maintained its monopsony power.

178.   There is no procompetitive justification for Volkswagen's anticompetitive conduct that outweighs its anticompetitive effects.  Any possible procompetitive benefits could have been achieved by less restrictive alternatives.

179.   Volkswagen's willful acquisition or maintenance of its monopsony power described in this Complaint injured, and continues to injure, Prevent in its business or property.  Prevent suffered antitrust injury because:

(a)     Volkswagen subjected Prevent to infracompetitive prices for automotive component parts;

(b)     Volkswagen's anticompetitive agreements to block Prevent's procompetitive acquisitions foreclosed Prevent from the market for automotive component parts, including the relevant individual product sub-markets;

(c)     Volkswagen's anticompetitive agreements with the Target Companies to block Prevent's acquisitions decreased productive efficiency; and

(d)     Volkswagen conduct caused Prevent to reduce its automotive component part output.

180.   The injury to Prevent was a foreseeable consequence of Volkswagen's willful maintenance or acquisition of its monopsony power.

### Claim 3:  Violation of Sherman Act § 2, Attempted Monopsonization

181.   Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

182.   In the alternative to the Claim 2 for Monopsonization in violation of Sherman Act § 2, Volkswagen attempted to monopsonize the automotive component part supply market, including each of the relevant product sub-markets.

183.   The relevant market is the worldwide automotive component part market, including the relevant product sub-markets.

184.   Volkswagen restrained trade in the automotive component part market by inducing suppliers to thwart procompetitive acquisitions.  This conduct, including blocking Prevent from acquiring each of the Target Companies, was both predatory and anticompetitive.

185.   Volkswagen had a specific intent to monopsonize the automotive component part supply market, including the relevant product sub-markets.

186.   There is no procompetitive justification for Volkswagen's anticompetitive conduct that outweighs its anticompetitive effects.  Any possible procompetitive benefits could have been achieved by less restrictive alternatives.

187.   Volkswagen had a dangerous probability of achieving monopsony power.

188.   As a direct and proximate result of Volkswagen's predatory and anticompetitive conduct, Prevent suffered injury because:

(a)   Volkswagen subjected Prevent to infracompetitive prices for automotive component parts;

(b)   Volkswagen's anticompetitive agreements to block Prevent's procompetitive acquisitions foreclosed Prevent from the market for automotive component parts, including the relevant individual product sub-markets;

(c)   Volkswagen's anticompetitive agreements with the Target Companies to block Prevent's acquisitions decreased productive efficiency; and

(d)   Volkswagen conduct caused Prevent to reduce its automotive component part output.

189.   The injury to Prevent was a foreseeable consequence of Volkswagen's anticompetitive conduct, which was done with the intent of monopsonizing the market for automotive component parts.

### Claim 4:  Violation of Michigan Antitrust Law, M.C.L. § 445.772, Agreement in Restraint of Trade

190.   Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

191.   The agreements between Volkswagen and the Target Companies to block Prevent's acquisition attempts unreasonably restrain trade and commerce throughout the State of Michigan in violation of Section 2 of the Michigan Antitrust Reform Act, M.C.L. § 445.772.

192.   As alleged, Volkswagen has engaged and participated in one or more contracts, combinations, or conspiracies to artificially restrict competition for automotive component parts.  Volkswagen expressly agreed with Target Companies' management to block acquisition attempts by Prevent.

193.   Volkswagen's conduct is per se unlawful under the Michigan Antitrust Reform Act.  Alternatively, Volkswagen's conduct is an unreasonable restraint of trade under the rule of reason.

194.   Volkswagen has committed at least one overt act in furtherance of the conspiracy alleged in this Complaint.

195.   Volkswagen's actions as part of, and in furtherance of, its contracts, combinations, or conspiracies in restraint of trade were authorized, ordered, or done by one or more of Volkswagen's officers, agents, employees, or

representatives while actively engaged in the management of Volkswagen's affairs.

196.   Volkswagen's anticompetitive acts had, and continue to have, substantial, unreasonable, and foreseeable effects on interstate commerce in the automotive component part market, including in each of the relevant product sub-markets.  These anticompetitive effects include:

     (a)    Artificial foreclosure of competitors, including Prevent;

     (b)    Artificial reduction in market output and infracompetitive prices for automotive component parts; and

     (c)    Artificial reduction in innovation and quality in the automotive component part supply market.

197.   Any competitive benefits from the conduct of Volkswagen and the Target Companies do not outweigh the actual and likely anticompetitive effects of the agreements.  Any possible procompetitive benefits of the agreements with the Target Companies could have been achieved by less restrictive alternatives.

198.   Prevent was harmed, and continues to be harmed, as a result of Volkswagen's anticompetitive conduct.  Prevent suffered antitrust injury because:

     (a)    Volkswagen subjected Prevent to infracompetitive prices for automotive component parts;

(b)      Volkswagen's anticompetitive agreements to block Prevent's procompetitive acquisitions foreclosed Prevent from the market for automotive component parts, including the relevant individual product sub-markets;

(c)      Volkswagen's anticompetitive agreements with the Target Companies to block Prevent's acquisitions decreased productive efficiency; and

(d)      Volkswagen conduct caused Prevent to reduce its automotive component part output.

199.   The injury to Prevent was a foreseeable consequence of Volkswagen's anticompetitive agreements with the Target Companies.

### Claim 5:  Violation of Michigan Antitrust Law, M.C.L. § 445.773, Monopsonization

200.   Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

201.   Volkswagen's conduct unreasonably restrains trade and commerce throughout the State of Michigan in violation of Section 3 of the Michigan Antitrust Reform Act, M.C.L. § 445.773 because Volkswagen monopsonized the market for automotive component parts.

202.   The relevant market is the worldwide automotive component part market, including the relevant product sub-markets.

203.   Volkswagen has monopsony market power in the market for the automotive component parts, including in each of the relevant individual product sub-markets.

204.   Volkswagen's monopsony power is not the consequence of a superior product, business acumen, or historical accident.  Instead, Volkswagen's monopsony power stems from its anticompetitive upstream control strategy, including its anticompetitive interference with procompetitive supplier acquisitions, which unreasonably restrains trade.  Volkswagen therefore willfully acquired or maintained its monopsony power.

205.   There is no procompetitive justification for Volkswagen's anticompetitive conduct that outweighs its anticompetitive effects.  Any possible procompetitive benefits could have been achieved by less restrictive alternatives.

206.   Volkswagen's willful acquisition or maintenance of its monopsony power described in this Complaint injured, and continues to injure, Prevent in its business or property.  Prevent suffered antitrust injury because:

(a)    Volkswagen subjected Prevent to infracompetitive prices for automotive component parts;

(b)    Volkswagen's anticompetitive agreements to block Prevent's procompetitive acquisitions foreclosed Prevent from the market for automotive component parts, including the relevant individual product sub-markets;

(c)     Volkswagen's anticompetitive agreements with the Target Companies to block Prevent's acquisitions decreased productive efficiency; and

(d)     Volkswagen conduct caused Prevent to reduce its automotive component part output.

207.   The injury to Prevent was a foreseeable consequence of Volkswagen's willful maintenance or acquisition of its monopsony power.

### Claim 6:  Violation of Michigan Antitrust Law, M.C.L. § 445.773, Attempted Monopsonization

208.   Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

209.   In the alternative to Claim 5, Volkswagen's conduct unreasonably restrains trade and commerce throughout the State of Michigan in violation of Section 3 of the Michigan Antitrust Reform Act, M.C.L. § 445.773 because Volkswagen attempted to monopsonize the market for automotive component parts.

210.   The relevant market is the worldwide automotive component part market, including the relevant product sub-markets.

211.   Volkswagen restrained trade in the automotive component part market by inducing suppliers to thwart procompetitive acquisitions.  This conduct, including blocking Prevent from acquiring each of the Target Companies, was both predatory and anticompetitive.

212.   Volkswagen had a specific intent to monopsonize the automotive component part supply market, including the relevant product sub-markets.

213.   There is no procompetitive justification for Volkswagen's anticompetitive conduct that outweighs its anticompetitive effects.  Any possible procompetitive benefits could have been achieved by less restrictive alternatives.

214.   Volkswagen had a dangerous probability of achieving monopsony power.

215.   As a direct and proximate result of Volkswagen's predatory and anticompetitive conduct, Prevent suffered injury because, among other things:

(a)    Volkswagen subjected Prevent to infracompetitive prices for automotive component parts;

(b)    Volkswagen's anticompetitive agreements to block Prevent's procompetitive acquisitions foreclosed Prevent from the market for automotive component parts, including the relevant individual product sub-markets;

(c)    Volkswagen's anticompetitive agreements with the Target Companies to block Prevent's acquisitions decreased productive efficiency; and

(d)    Volkswagen conduct caused Prevent to reduce its automotive component part output.

216.   The injury to Prevent was a foreseeable consequence of Volkswagen's anticompetitive conduct, which was done with the intent of monopsonizing the market for automotive component parts.

### Claim 7:  Tortious Interference with Business Relationship and/or Expectancy

217.   Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

218.   Prevent had a valid business relationship and/or expectancy in the potential acquisition of Tower International.  Prevent had more than a subjective belief that it would complete the acquisition because both the Tower CEO and Tower Americas CFO expressed a willingness and desire to sell to Prevent but for Volkswagen's interference, the Brazil business was publicly held for sale, the Tower board had approved a plan to sell the Brazil business, the Brazil operations were a significant loss maker for Tower, Prevent's offer was the only offer at the time, and Prevent's offer would have maximized shareholder value.

219.   Volkswagen knew about the relationship or expectancy between Prevent and Tower because Volkswagen explicitly conditioned future dealings between Volkswagen and Tower on Tower refusing to sell to Prevent.

220.   Volkswagen intentionally interfered in the relationship or expectancy between Prevent and Tower.  Tower expressly refused to accept Prevent's offer

because of Volkswagen's interference.  But for Volkswagen's interference, Tower would have accepted Prevent's offer.

221.    Volkswagen's conduct satisfies the wrongful act requirement because:

(a)    Volkswagen's conduct is anticompetitive, violating federal and state antitrust law;

(b)    Volkswagen conspired to cause, aided and abetted, or otherwise induced Tower management to breach the fiduciary duties owed to their shareholders, including the duties of loyalty, honesty, good faith, and fair, open, and honest disclosure;

(c)    Volkswagen's conduct amounts to the Michigan tort of civil conspiracy; and

(d)    Volkswagen's acted with malice and without a valid business justification because the interference served no legitimate business or economic purpose.

222.    Volkswagen was not motivated by legitimate business reasons. Volkswagen does not have a legitimate business justification for its interference in Prevent's attempted acquisition of Tower.

223.    Volkswagen's interference was the direct and proximate cause of Prevent's failed acquisition of the Tower International.

224.    As a direct and proximate result of Volkswagen's conduct, Prevent suffered damages.

## Claim 8:  Civil Conspiracy

225.    Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

226.    Volkswagen and the Target Companies' management combined, through concerted action, to accomplish an unlawful purpose.

227.    The purpose of this conspiracy was unlawful because:

(a)    Volkswagen aided and induced Target Companies' management to breach their fiduciary duties to their shareholders;

(b)    The agreement was an unlawful restraint of trade in violation of state and federal antitrust law; and

(c)    Volkswagen's conduct amounts to tortious interference with a business expectancy in violation of state law.

228.    Volkswagen and the Target Companies' management acted together under a common plan or design.

229.    As a direct and proximate result of the conspiracy, Prevent was injured and suffered damages.

## Claim 9:  Unjust Enrichment

230.    Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

231.    Prevent provided substantial benefits to Volkswagen by selling component parts to Volkswagen at a price below the competitive level.

232.    As a result of Prevent's substantial efforts, Volkswagen received significant benefits, including the ability to procure component parts from Prevent and the Target Companies at prices and on terms that Prevent and the Target Companies would not have accepted in competitive market.

233.    Volkswagen unjustly retained the benefits conferred by Prevent by failing to pay Prevent a price for its component parts that was at or above the competitive level.

234.    It would be inequitable for Volkswagen to retain this benefit.

## IX.    <u>REQUEST FOR RELIEF</u>

235.    Prevent requests the following relief:

(a)    A jury verdict for the compensatory damages sustained by Prevent;

(b)    A judgment against Volkswagen, by the Court, in treble the amount of the jury verdict, and for attorneys' fees, costs, and interest under Section 15 of the Clayton Act, 15 U.S.C. § 15;

  (c)  A permanent injunction under Section 16 of the Clayton Act, 15 U.S.C. § 26, enjoining Volkswagen from future violations of the antitrust laws and from practices that facilitate those violations;

  (d)  Restitution and disgorgement; and

  (e)  Such other and further relief as the Court deems just and proper.

## X. **JURY DEMAND**

236. Prevent demands a trial by jury.

Dated November 18, 2019

Respectfully submitted,

**THE MILLER LAW FIRM, P.C.**

*/s/ E. Powell Miller*
E. Powell Miller (P 39487)
Martha J. Olijnyk (P60191)
950 W. University Dr., Ste. 300
Rochester, MI 48307
(248) 841-2200; (248) 652-2852 fax
epm@millerlawpc.com

**BOIES SCHILLER FLEXNER LLP**

Duane L. Loft (dloft@bsfllp.com)
NY Bar No. 4397733
(admission forthcoming)
Brianna S. Hills (bhills@bsfllp.com)
NY Bar No. 5652599
(admission forthcoming)
55 Hudson Yards
New York, New York 10001
Phone: (212) 446-2300

*Attorneys for Plaintiffs*