UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PREVENT USA CORPORATION and
EASTERN HORIZON GROUP
NETHERLANDS B.V.,

        Plaintiffs,                            Civil Action No. 19-CV-13400

vs.                                         HON. BERNARD A. FRIEDMAN

VOLKSWAGEN AG and
VOLKSWAGEN GROUP OF AMERICA, INC.,

        Defendants.

_____/

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

This matter is presently before the Court on defendants' motion to dismiss [docket entry 31]. Plaintiffs have responded and defendants have replied. Pursuant to E.D. Mich. LR 7.1(f)(2), the Court shall decide this motion without a hearing. For the reasons stated below, the Court shall grant the motion on forum non conveniens grounds.

### Background

This is an antitrust and business tort case. Plaintiffs Prevent USA Corporation ("Prevent USA") and Eastern Horizon Group Netherlands B.V. ("Eastern Horizon") belong to a cluster of related companies, collectively called "the Prevent Group," that manufacture a variety of parts for automobile manufacturers.[1] According to the Prevent Group website, its many companies

_____

[1] While the complaint asserts that "[t]he Plaintiff in this case is the Prevent Group—an international supplier with a subsidiary registered in this District," Compl. ¶ 1, this is not correct. As noted below, Prevent USA identifies itself as one of the companies of this group, or as a "subsidiary" of Prevent Group, *id.*, while Eastern Horizon identifies itself as a "holding company for newly-acquired Prevent Group operating companies." *Id.* ¶¶ 22, 23. It is unclear whether the Prevent Group is a distinct legal entity or a "network of companies," *id.* ¶ 21, but it is not a named party and it is not "the plaintiff in this case." Nonetheless–and confusingly– plaintiffs

collectively have over 10,000 employees in thirteen countries in South America and Europe (mainly in Brazil, Germany, Austria, Bosnia-Herzegovina, Slovenia, Croatia, Hungary, and Romania) manufacturing seat covers, metal components (e.g., transmission, engine, and brake parts), and various plastic components.  *See* www.preventgroup.com and www.preventgroup.ba (last visited Feb. 27, 2021).

Plaintiff Prevent USA "is a company within the Prevent Group, formed specifically to facilitate potential acquisitions in the United States.  Prevent USA Corporation is organized and existing under the laws of Pennsylvania and is registered to do business in the state of Michigan." Compl. ¶ 23.  It is a subsidiary of Prevent Group.  *Id.* ¶ 1.  Eastern Horizon "is a corporation organized and existing under the laws of the Netherlands with its principal place of business in Amsterdam, the Netherlands.  [It] is a company owned by the Hastor Family within the network of Prevent Group companies and operates as a holding company for newly-acquired Prevent Group operating companies."  *Id.* ¶ 22.  Volkswagen AG ("VWAG") is an automobile manufacturer "organized and existing under the laws of Germany with its principal place of business in Wolfsburg, Germany."  *Id.* ¶ 24.  And Volkswagen Group of America, Inc. ("VWGoA") is a New Jersey corporation whose principal place of business is located in Herndon, Virginia; it is a "wholly-owned subsidiary of [VWAG]."  *Id.* ¶ 25.

Plaintiffs allege, in short, that defendants have conspired to block the Prevent Group from acquiring other automobile parts suppliers.  According to plaintiffs, defendants have accomplished this by devising and implementing what defendants call "Project 1," a strategy,

---

Prevent USA and Eastern Horizon indicate that they use "Prevent" and "the Prevent Group" to refer to themselves collectively.  Compl. at 4.  *See also id.* ¶ 16 ("the Prevent Group brings this action against Volkswagen").

plaintiffs say, that is "designed to stop stronger suppliers—and Prevent specifically—from threatening Volkswagen's market power by acquiring smaller distressed suppliers." *Id.* ¶ 93.  The gist of plaintiffs' case is that defendants carried out Project 1 by identifying weak or failing suppliers which were vulnerable to being taken over by a larger, financially stronger supplier.  Then, "Volkswagen[2] undertook an anticompetitive campaign to block any such acquisitions, including by extracting written agreements from suppliers not to sell themselves to Prevent Group.  This strategy was carried out with the purpose and effect of suppressing competition, maintaining Volkswagen's market power over suppliers, and in the process causing massive losses to Prevent." *Id.* ¶ 1.

Plaintiffs provide three examples of how defendants allegedly carried out Project 1 to stop the Prevent Group from acquiring smaller parts suppliers.  First, plaintiffs point to their efforts to purchase a Polish parts supplier:

> In 2017, Prevent sought to acquire Inter Groclin Auto ("Groclin"), a Polish supplier of automotive seat covers, car seats, and other automotive upholstery.  Volkswagen quickly intervened.  On May 4, 2017, Volkswagen forced Groclin to execute an option contract requiring Groclin to notify Volkswagen of any potential sale, including the identity of the potential acquirer, and to give Volkswagen the right to purchase Groclin instead of the other acquirer.

---

[2] The Court notes that the complaint generally does not differentiate between VWAG and VWGoA, but refers to them jointly as "Volkswagen."  *See* Compl. at 4 (stating that plaintiffs "file this Complaint . . . against Volkswagen AG and Volkswagen Group of America, Inc. (collectively, 'Volkswagen')").  In summarizing the complaint, the Court adopts this convenience, although, as discussed below, it is important to keep in mind that Project 1 was, according to the complaint and documents filed by Prevent Group companies in other lawsuits in German courts, *see infra*, conceived in Germany by VWAG.  So far as the Court can discern, the complaint's only allegation concerning VWGoA's involvement in this scheme was that it "contributed at least four suppliers to the List," i.e., Project 1's "watch list" of parts suppliers vulnerable to takeover.  Compl. ¶ 101.  Plaintiffs identify only one of these suppliers, FTE, *id.*, and FTE is not among the American companies that Prevent Group allegedly sought to acquire. *See id.* ¶ 124.

*Id.* ¶ 10.  A second example is alleged to be evident in the Prevent Group's efforts to acquire a parts supplier in Germany:

> In another instance, Volkswagen blocked Prevent's attempts to acquire Grammer AG and its U.S. subsidiaries.  Volkswagen agreed with Grammer management to block Prevent's acquisition by threatening to stop doing business with Grammer.  Grammer management agreed to make a statement to shareholders condemning the deal, to stop communicating with Prevent, and to seek permission from Volkswagen before accepting any offer.

*Id.* ¶ 11.  This incident involving Grammar allegedly occurred in 2016-2017.  *See id.* ¶¶ 107-13.  The third example concerns the Prevent Group's efforts to acquire the Brazilian operations of a Michigan-based company:

> In 2016, Prevent sought to acquire the Brazilian operations of Tower International, Inc., a supplier headquartered in Livonia, Michigan. Prevent's approaches to Tower's management in Michigan were rebuffed at every turn, with statements such as "Tower can not [sic] do a transaction with [Prevent]" and "please ask the head of Purchasing for Volkswagen Brazil to advise us that they would have no issue if Tower Aruja [Brazil] were sold to your company."  Tower cited no other business reason for turning away the acquisition.
>
> . . . In a conversation with a third-party advisor, the CFO for Tower's Americas operations admitted that Volkswagen made Tower "agree in writing that [Tower] would not sell to a Prevent associated company."  This is direct evidence of Volkswagen reaching into this District to negotiate and execute an anticompetitive agreement.  This direct evidence, along with the evidence of similar agreements with European suppliers and Volkswagen's internal Project 1 strategy, makes it plausible to infer that Volkswagen executed similar agreements with at least seven other Michigan-based suppliers, six of which are headquartered in this District, which Prevent sought to acquire but was unable to as a result of Volkswagen's conduct.

*Id.* ¶¶ 12, 13 (emphasis omitted).

Project 1 allegedly is part of a larger Volkswagen strategy to abuse its market power to force Tier 2 and Tier 3 supplier "to accept prices and terms below competitive levels," *id.* ¶ 57,

"and in some instances below the price those manufacturers paid for the raw materials." *Id.* ¶ 59. Volkswagen's alleged strategy is to "dig . . . deep into the supply chain to control Tier 2 and Tier 3 suppliers." *Id.* ¶ 55. Plaintiffs allege that Volkswagen devised Project 1 in response to the Prevent Group's 2016 acquisition of the German parts supplier Car Trim because this acquisition "transformed Car Trim from a compliant participant in Volkswagen's abuse of market power into a company with enough bargaining power to resist it." *Id.* ¶ 90.

Details about Project 1 allegedly come from "internal Volkswagen documents" provided by "a senior Volkswagen executive with first-hand knowledge of the internal documents and events alleged herein." *Id.* ¶ 93 n.5. These documents purportedly

> flagged the risk of consolidation among suppliers with high reliance on Volkswagen and long transfer times to switch to another supplier—in other words, the suppliers most vulnerable to Volkswagen's market power. Prevent, in particular, Volkswagen representatives warned, "continue[d] to actively exert pressure on Volkswagen through further takeovers!"

> The [internal Project 1] presentations further summarized Volkswagen's goals of "scouring the supplier portfolio" for additional "small to mid-size suppliers with high dependency potential," implementing pre-acquisition options in contracts with suppliers that include the right to refuse acquisitions for "quality issues," checking existing "pre-purchase options to get visibility into potential sales," and "[i]nfluenc[ing] consequently the M&A activities of global players."

> As part of these efforts, Volkswagen maintained an expansive internal spreadsheet that carefully tracked the financial health of suppliers in every level of its supply chain. This spreadsheet—referred to internally at Volkswagen as "the 'Problematic Suppliers List' or the 'Watch List' (hereinafter, the 'List')—included external financial ratings for each supplier, each supplier's reliance on Volkswagen by percentage of sales, a "depth rating" for each supplier, and Volkswagen's plans for dealing with the supplier. In the "status" column, Volkswagen recorded any information on change of control, including whether a potential

purchaser had signed a Letter of Intent to purchase the supplier, and the identities of potential acquirers.

* * *

The List is evidence that Volkswagen regularly entered "Letter of Comfort" agreements with failing suppliers to block takeover attempts. For example, in the row for one supplier noted as an acquisition risk, Alu Menziken Euromotive GmbH, Volkswagen writes as next steps: "Agreement of general LOC including information requirement or non-procurement recommendation." Another supplier, AD Plastik D.D., appears on the List with an entry (attributed to Volkswagen Risk Management) that "[d]ue to historical connections to Prevent we recommend placing on the watchlist."

The Volkswagen entities and business divisions identified on the List as responsible for identifying and managing the relationships with the potential targets included Volkswagen Group of America. Volkswagen Group of America contributed at least four suppliers to the List. For example, the List says that for one supplier, FTE, Volkswagen Group of America is noted the [sic] "origin" of FTE's inclusion on the List, and FTE's risk rating is noted as "estimated by VWGoA."

*Id*. ¶¶ 96-98, 100-101 (emphasis omitted). Plaintiffs further allege that

[i]n March 2018, executing on its Project 1 strategy, Volkswagen abruptly cancelled all existing long term contracts with Prevent. In total, Volkswagen issued over a dozen cancellations, including for all existing contracts between Volkswagen and the following Prevent entities: Prevent DEV GmbH, Prevent TWB GmbH & Co. KG, Eastern Horizon Group Netherlands B.V., Prevent Foamtec GmbH, ES Automobilguss GmbH, Car Trim GmbH, and Eybl Austria GmbH.

*Id.* ¶ 102.

Volkswagen allegedly carried out Project 1 by "extract[ing] agreements from suppliers—in writing—promising Volkswagen that the suppliers would not sell themselves or their assets to any company in the Prevent Group." *Id.* ¶ 104. Volkswagen allegedly used various tactics to block Prevent Group from acquiring two parts suppliers in Europe, including

6

> making misleading statements to the acquisition targets' shareholders to induce the shareholders to reject Prevent's offer, soliciting and securing alternative offers or buyers, contacting the acquisition targets' other large customers to convince those customers to oppose the transaction, directly lobbying shareholders and other directors to vote against or otherwise block the transaction, and entering option agreements under which Volkswagen could purchase the company in the event of an acquisition it did not like.

*Id.* ¶ 106. Volkswagen allegedly used these tactics, and others, to block Prevent Group's attempted acquisition of Grammer (in Germany) and Groclin (in Poland) in 2017. *Id.* ¶¶ 107-13, 114-16.

Plaintiffs allege that beginning in 2014, the Prevent Group contemplated acquiring parts suppliers in the United States. *Id.* ¶ 117. Seven such companies allegedly were also on Volkswagen's "watch list":

> (a) Tower International, a supplier of metal automotive body structures headquartered in Livonia, Michigan;
>
> (b) Hilite International, a supplier of engine and transmission components headquartered in Germany, with its North American Sales and Research and Development Center in Orion, Michigan;
>
> (c) Camaco-Amvian, a supplier of metal seat structures headquartered in Farmington Hills, Michigan;
>
> (d) Dura Automotive Systems, a supplier of control and structural systems headquartered in Auburn Hills, Michigan;
>
> (e) Visteon, a supplier of interior electronics headquartered in Van Buren Charter Township, Michigan;
>
> (f) Key Plastics, a plastic interior and exterior trim supplier headquartered in Livonia, Michigan; and
>
> (g) Mahle Industries, Inc., a supplier of air systems and fuel management systems headquartered in Farmington Hills, Michigan.

*Id.* ¶ 124. Volkswagen allegedly "deployed a variety of tactics to stop the acquisition of these Target Companies by stronger suppliers, and by Prevent in particular. . . . When an advisor would

consider Prevent as a potential acquirer, Volkswagen intervened to stop the sale." *Id.* ¶ 130. Volkswagen allegedly also "resorted to extracting agreements from the Target Companies that explicitly prevented any sale of their business that might threaten Volkswagen." *Id.* ¶ 131. As noted above, the complaint alleges that "Prevent sought to acquire [these companies] but was unable to as a result of Volkswagen's conduct." *Id.* ¶ 13.

> Specifically regarding the first American company on this list, plaintiffs allege:
>
> In April 2016, Tower publicly announced that it was selling its operations in Brazil and China. . . .
>
> Volkswagen had included Tower on its List of Problematic Suppliers. . . . In the status column, Volkswagen notes that "[c]onversation with Tower is done" and "[o]bligation to provide information as agreed for Tower Europe." . . .
>
> On May 19, 2016, a Prevent representative emailed Tower Americas CFO Phil Pfefferle in response to Tower's public announcement of the sale. Almost instantly, however, Pfefferle responded that "Tower can not [sic] do a transaction with [Prevent]." After additional back and forth, Prevent emailed an offer to Tower Director of Investor Relations Derek Fiebig. Prevent offered to purchase all Tower's Brazilian operations for 200 million Brazilian Real (about $48.6 million).
>
> \*   \*   \*
>
> It ultimately became clear, however, that Volkswagen was standing in the way of a potential acquisition by Prevent.
>
> On June 22, 2016, Tower CEO Mark Malcolm responded to Prevent's offer. Malcolm wrote: "Volkswagen is the largest customer of Tower in Aruja [Brazil] and is also Tower's largest customer in Europe, so we cannot risk creating a problem. If our understanding is correct, please ask the head of Purchasing for Volkswagen Brazil to advise us that they would have no issue if Tower Aruja [Brazil] were sold to your company." In a follow-up email the next day, Malcolm wrote "[i]f and when you are confident that Volkswagen Purchasing would support a possible acquisition of Tower Aruja [Brazil] by your company, please ask Volkswagen

8

Purchasing to so advise Tower Brazil's President."

In February 2017, a Prevent representative met with Tower's Brazilian Purchasing Manager, to discuss buying Tower's Brazilian business. According to an email account from a Prevent employee, during that meeting, on February 21, 2017, the Tower purchasing manager reported being told by Tower International management that "VW demanded that they [Tower International management] sign a document that informed of any sale to any interested party, specifically to Keiper [a Prevent entity], giving VW the right of option before selling the business."

Eventually, the full story came out. In a conversation with a third-party advisor in 2019, the Tower Americas CFO, Phil Pfefferle, admitted that in negotiations with Volkswagen, "I had to agree in writing that [Tower] would not sell to a Prevent associated company."

It is plausible to infer that the negotiations leading to this agreement were systematic and continuous from at least mid-2016 to early 2017, during the time of Tower's potential sale of its Brazilian operations, and that the negotiations were carried out with Tower management from their headquarters in Livonia, Michigan.

The purpose and effect of the agreement between Volkswagen and Tower was to foreclose any potential acquisition by Prevent of Tower's operations, which included operations in the United States, and operations that produced and sold automotive component parts in the United States for vehicles sold in the United States.

*Id.* ¶¶ 133-35, 137-42 (footnotes and emphasis omitted).

Plaintiffs allege that "it is plausible to infer that Volkswagen entered into similar agreements with the other Target Companies" (i.e., the other American companies the Prevent Group sought to acquire) to stop them from selling to the Prevent Group. *Id.* ¶ 145. Plaintiffs point to their failed attempts to acquire Grammer in Germany and Groclin in Poland; the inclusion of the Target Companies on Volkswagen's watch list; the fact that the Prevent Group expressed interest in acquiring these companies; the fact that Project 1 purportedly "outlined a deliberate strategy to

9

stop Prevent from 'continu[ing] to exert pressure on Volkswagen through further takeovers!'"; the alleged fact that "Volkswagen actively pressured merger and acquisition advisors, including Morgan Stanley in the case of Grammer AG, not to contact or solicit bids from Prevent for failing automotive companies"; and the alleged fact that "Volkswagen actively pressured distressed suppliers not to sell their companies to Prevent, threatening to stop doing business with the suppliers if they allowed Prevent's acquisition." *Id.* ¶¶ 146-51.  This, according to plaintiffs, "makes it plausible to infer that Volkswagen engaged in the same or similar anticompetitive conduct to stop Prevent from acquiring each of the Target Companies." *Id.* ¶ 152.

Plaintiffs allege that if Volkswagen had not blocked the Prevent Group's acquisition of the seven American parts suppliers, the acquisitions would have "allow[ed] Prevent to capitalize on economies of scale and scope [and] . . . increased the output in each of the relevant product sub-markets by allowing Prevent to resist Volkswagen's infracompetitive price and supply terms." *Id.* ¶ 155.  Plaintiffs conclude that "by artificially restraining competition in the automotive component part market, and artificially reducing the output in that market, Volkswagen's anticompetitive actions had a direct, substantial, and reasonably foreseeable effect on United States commerce." *Id.* ¶ 156.  Additionally, plaintiffs allege that the Prevent Group was harmed by being deprived of these investment opportunities.  Plaintiffs allege that "[u]pon the successful deployment of that capital through acquisition of the Target Companies, Prevent projected a return of between $750 million and $1 billion over five to seven years." *Id.* ¶ 159.

Based on these allegations, plaintiffs assert antitrust and business tort claims.  Their first claim is that "Volkswagen has engaged and participated in one or more contracts, combinations, or conspiracies to artificially restrict competition for automotive component parts.  Volkswagen

expressly agreed with Target Companies' management, including management of Tower, to block acquisition attempts by Prevent." *Id*. ¶ 163. This is alleged to be "an unreasonable restraint of trade under the rule of reason," in violation of § 1 of the Sherman Act, 15 U.S.C. § 1. *Id.* ¶ 164. Plaintiffs' fourth claim is identical, but based on a Michigan antitrust statute, Mich. Comp. Laws § 445.772. *Id.* ¶¶ 190-99.

Plaintiffs' second claim, for "monopsonization," is brought under § 2 of the Sherman Act, 15 U.S.C. § 2. Plaintiffs allege that Volkswagen has "monopsony power [that] stems from its anticompetitive upstream control strategy, including its anticompetitive interference with supplier acquisitions, which unreasonably restrains trade" and that Volkswagen's "acquisition or maintenance" of this power has caused Prevent antitrust injury. *Id.* ¶¶ 177, 179. Plaintiffs' fifth claim is identical, but based on a Michigan antitrust statute, Mich. Comp. Laws § 445.773. *Id.* ¶¶ 200-07.

Plaintiffs' third claim, for "attempted monopsonization," also brought under § 2 of the Sherman Act, is presented as an alternative to their second claim, but based on the allegation that "Volkswagen had a dangerous probability of achieving monopsony power." *Id.* ¶ 187. Plaintiffs' sixth claim is identical, but based on a Michigan antitrust statute, Mich. Comp. Laws § 445.773. *Id.* ¶¶ 208-16.

Plaintiffs' seventh claim, for tortious interference with a business relationship and/or expectancy, alleges that "Prevent had a valid business relationship and/or expectancy in the potential acquisition of Tower International," that "Volkswagen explicitly conditioned future dealings between Volkswagen and Tower on Tower refusing to sell to Prevent," and that "Tower expressly refused to accept Prevent's offer because of Volkswagen's interference." *Id.* ¶¶ 218-20.

11

Plaintiffs' eighth claim, for civil conspiracy, alleges that Volkswagen conspired with the management of the "target companies" to "breach [these companies'] fiduciary duties to their shareholders," restrain trade, and interfere with Prevent's business expectancy. *Id.* ¶¶ 226, 227.

Finally, plaintiffs' ninth claim, for unjust enrichment, alleges that "[a]s a result of Prevent's substantial efforts, Volkswagen received significant benefits, including the ability to procure component parts from Prevent and the Target Companies at prices and on terms that Prevent and the Target Companies would not have accepted in [a] competitive market," and that "Volkswagen unjustly retained the benefits conferred by Prevent by failing to pay Prevent a price for its component parts that was at or above the competitive level." *Id.* ¶¶ 232, 233.

For relief, plaintiffs seek compensatory damages (trebled under the Clayton Act), attorney fees, costs, interest, an injunction "enjoining Volkswagen from future violations of the antitrust laws and from practices that facilitate those violations," restitution, and disgorgement. *Id.* ¶ 235.

### *Forum Non Conveniens*

Defendants seek dismissal on a number of grounds, but the Court finds the first, under the doctrine of forum non conveniens, to be persuasive and dispositive. "When a court declines to exercise jurisdiction under forum non conveniens, it is saying that the case should be tried elsewhere." *Jones v. IPX Int'l Eq. Guinea, S.A.*, 920 F.3d 1085, 1090 (6th Cir. 2019). For the following reasons, the Court concludes that the present case, which is the continuation of an ongoing dispute (that has been and is currently being litigated in German courts) between European companies over an allegedly unlawful business strategy devised by a German company in Germany, should be tried in Germany.

12

In deciding a motion to dismiss on this basis, the Court

address[es] three major considerations.

First, forum non conveniens is proper only when an adequate alternative forum is available.  In other words, a court will not dismiss if the parties cannot seek justice in the courts of another sovereign. . . .

Second, a balance of the relevant interests must weigh heavily in favor of dismissal to justify invocation of forum non conveniens. Here, the *Gulf Oil* case set forth a litany of nonexclusive "public interest" and "private interest" factors to be balanced. . . . On the private side, among other things, courts assess the relative access to sources of proof and availability of compulsory process. On the public side, for instance, they will look to administrative difficulties in hearing the case and enforcing a judgment. . . .

Third, the court must determine the degree of deference it should accord the plaintiff's choice of forum.

14D C. Wright & A. Miller, *Federal Practice and Procedure* § 3828 (4th ed.) (footnotes omitted).

The Sixth Circuit has also identified these as the relevant considerations.  *See Jones,* 920 F.3d at

1090; *Hefferan v. Ethicon Endo-Surgery Inc*., 828 F.3d 488, 493 (6th Cir. 2016).  When forum non

conveniens dismissal is sought, "[e]ach case turns on its facts."  *Williams v. Green Bay & W.R. Co.*,

326 U.S. 549, 557 (1946).  "[F]orum non conveniens analysis does not turn on any one factor."

*Wong v. PartyGaming Ltd.*, 589 F.3d 821, 831 (6th Cir. 2009) (citing *Piper Aircraft Co. v. Reyno*,

454 U.S. 235, 250 (1981)).

### *Availability of an Adequate Alternative Forum*

Under the first part of the analysis, an adequate alternative forum must be identified. *Stewart v. Dow Chems. Co.*, 865 F.2d 103, 106 (6th Cir.1989). This requirement will be satisfied if the defendant is "amenable to process" in the foreign jurisdiction. *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255 n. 22, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981). An alternative forum is inadequate if "the remedy provided by [it] is so clearly inadequate or unsatisfactory that it is no remedy

13

> at all." *Id*. at 254, 102 S.Ct. 252. Less favorable law in the alternative
> forum will not, on its own, make the forum inadequate. *Id*.

*Wong*, 589 F.3d at 830-31. *See also Jones*, 920 F.3d at 1091 ("An alternative forum is available if the defendant is amenable to process there. . . . A forum is adequate if it can remedy the alleged harm."). The remedy in the alternative forum need not provide the same relief as would an American court. As the Sixth Circuit has stated,

> [i]n extraordinary cases, an unfavorable difference in law is relevant to the inquiry. If the available remedy in the alternative forum is "clearly inadequate or unsatisfactory"—for example, the jurisdiction "does not permit litigation of the subject matter of the dispute"—dismissal would thwart the interest of justice. *Id*. at 254 & n.22, 102 S. Ct. 252 (citing *Phx. Can. Oil Co. v. Texaco, Inc*., 78 F.R.D. 445 (Del.1978)). Law that is simply less favorable to the plaintiff in the alternative forum is not so extraordinary as to render that forum inadequate. *Wong v. PartyGaming Ltd.*, 589 F.3d 821, 831 (6th Cir. 2009).

*Hefferan*, 828 F.3d at 494-95.

Germany is an available and adequate forum for the litigation of the instant dispute. Both VWAG and VWGoA are amenable to process in Germany, and plaintiffs' claims could be brought in German courts. *See* Huesstege Decl. ¶¶ 6-37 (PageID.2252-61); Wurnmest Decl. ¶¶ 5-34 (PageID.2263-76).[3] Germany has a well developed and sophisticated legal system that, as many other courts have recognized, provides an adequate forum for the resolution of a broad array of legal

---

[3] Dr. Huesstege is a retired German judge and an expert on German civil procedure. Huesstege Decl. ¶ 2 (PageID.2251). Dr. Wurnmest is a German law professor with expertise in commercial law, private international law, and comparative law. Wurnmest Decl. ¶ 1 and Wurnmest CV (PageID.2262, 2277). The Court is aware that plaintiffs have submitted counter-declarations from their own experts, German law professors Drs. Koehler (PageID.2138-52) and Lueke (PageID.2153-57), who doubt whether plaintiffs' claims could be brought in German courts and note Germany's less generous damages awards and more stringent discovery rules. The Court has weighed these competing declarations under Fed. R. Civ. P. 44.1 and is convinced that plaintiffs could bring their antitrust and business tort claims in Germany.

14

disputes. *See, e.g., Hefferan*, 828 F.3d 488 (affirming the district court's determination that Germany was an adequate forum for plaintiff's negligence, loss of consortium, and product liability claims despite the fact that "the German system employs court-appointed experts, has lower average damages awards for pain and suffering than the United States, and lacks jury trials, party-directed pretrial discovery, and punitive damages"); *Bintu v. Delta Airlines, Inc*., No. 1:19-CV-04775-SDG, 2020 WL 3404925, at *2 (N.D. Ga. June 12, 2020) (finding Germany to be an adequate forum for plaintiff's personal injury claim despite Germany's more restrictive discovery rules, and noting that "[c]ourts have routinely found that German courts . . . are adequate fora despite these same concerns"); *Biotronik, Inc. v. Zurich Ins. PLC Niederlassung Fuer Deutschland*, No. 3:18-CV-01631-SB, 2020 WL 996599, at *2 (D. Or. Feb. 28, 2020) (finding Germany to be an adequate forum for plaintiff's claims of breach of the implied covenant of good faith and fair dealing); *Bentel & Co., LLC v. Schraubenwerk Zerbst GmbH*, No. 16 C 11479, 2017 WL 3278324, at *11 (N.D. Ill. Aug. 2, 2017) (finding Germany to be an adequate forum for plaintiff's claims of breach of contract, unpaid sales commissions, and unjust enrichment); *GoldenTree Asset Mgmt. LP v. BNP Paribas S.A.*, 64 F. Supp. 3d 1179, 1193 (N.D. Ill. 2014) (finding Germany to be an adequate forum for plaintiff's claims of corporate fraud, despite that country's limitations on discovery compared to those in the United States, and noting that "Germany is among the 13 nations whose courts have been consistently deemed to be adequate alternative fora"); and *Kirch v. Liberty Media Corp*., No. 04-667, 2006 WL 3247363, at *5 (S.D.N.Y. Nov. 8, 2006) ("[T]he unlawful, intentional, and malicious interference with specific contracts of other persons are torts recognized by the German Civil Code.").

Additionally, the fact that Prevent Group companies have filed several lawsuits

against VWAG and its subsidiaries in German courts for unfair competition and antitrust violations arising from their alleged execution of Project 1 is powerful evidence that plaintiffs themselves recognize Germany as an available and adequate forum for the litigation of such disputes. *See Faber-Plast GmbH v. Kleinert*, 997 F. Supp. 846, 847 (E.D. Mich. 1998) (finding Germany to be an adequate alternative forum in part because "the parties have engaged, and indeed continue to engage, in litigation in Germany, and a substantial part of the events giving rise to the instant suit occurred in Germany"). The most recent such lawsuit, described below, which was filed in a German court in December 2019 by the assignee of several Prevent Group companies against VWAG and a number of its subsidiaries, contains allegations that are nearly identical to those made in the present case. Plainly, the Prevent Group views Germany as an available and adequate forum.

The Prevent Group's own litigation history, the information provided by Drs. Huesstege and Wurnmest, and the extensive case authority on this issue, collectively convince the Court that Germany is an available and adequate forum for the litigation of plaintiffs' antitrust and other business tort claims against VWAG and VWGoA.

### *Public Interest and Private Interest Factors*

"If an adequate alternative forum is available, then courts examine whether the plaintiff's choice of forum is unnecessarily burdensome. *Zions First*, 629 F.3d at 523. To guide that analysis, courts look to the private and public interests that the Supreme Court listed in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947)." *Jones,* 920 F.3d at 1092. The Court therefore turns now to an examination of these interests.

### A. *Public Interest Factors*

The Court must consider the public interest factors, which

> include the administrative difficulties of litigation in congested
> centers instead of the suit's place of origin, the burden of jury duty on
> citizens of communities with no relation to the case, the importance
> of trying the case in view and reach of others that may be affected,
> the local interest in having localized controversies decided at home,
> and the appropriateness of having trial at home with the law that
> governs the case.

*Jones*, 920 F.3d at 1093 (citing *Gulf Oil*, 330 U.S. at 508-09). "To evaluate [the public interest]

factors, the court must consider the locus of the alleged culpable conduct, often a disputed issue, and

the connection of that conduct to the plaintiff's chosen forum." *Van Cauwenberghe v. Biard*, 486

U.S. 517, 528 (1988).

In the present case, the public interest factors weigh strongly in favor of litigating this

case in Germany. While the Court sees no administrative difficulty in litigating the case in Detroit,

"the burden of jury duty on citizens of communities with no relation to the case" is significant.

Michigan jurors would have scant relation to this case, which concerns a German company's alleged

plan (devised in Germany by VWAG and participated in nominally by VWGoA) to stop Prevent

Group from acquiring other parts suppliers in Germany, Poland, and Brazil. The only connection

with Michigan is plaintiffs' allegation that they were unable to acquire a Brazilian company (Tower

Aruja or Tower Brazil) because its parent company, Michigan-based Tower International, would not

authorize the sale without the agreement of "the head of Purchasing for Volkswagen Brazil."

Compl. ¶ 138. That is to say, Michigan jurors would be expected to evaluate the efforts of one

foreign company (VWAG) to stop other foreign companies (the Prevent Group) from purchasing

a third foreign company (Tower Brazil). The remaining Michigan connections, i.e., that defendants

were allegedly responsible for preventing defendants from acquiring other Michigan-based

companies, are speculative and carry little, if any, weight in this calculus.

17

Conversely, "the importance of trying the case in view and reach of others that may be affected, the local interest in having localized controversies decided at home" weighs heavily in favor of litigating this dispute in Germany.  The "locus of the alleged culpable conduct," *Biard*, 486 U.S. at 528, is Germany, as that is where Project 1 allegedly was devised and adminstered.  The Prevent Group itself has acknowledged this in the many lawsuits its companies and assignee have brought in various German courts, as is discussed in more detail below.  Project 1 is the focal point of plaintiffs' dispute with Volkswagen – "the suit's place of origin," *Jones*, 920 F.3d at 1093 – and Germany is the country with the greatest interest in the controversy.

The analysis does not change if one focuses on the "place of injury" rather than "the place of corporate decision making." *Solari v. Goodyear Tire & Rubber Co.*, 654 F. App'x 763, 769 (6th Cir. 2016).   In the present case, the places of injury are Brazil, Poland, and Germany, where the suppliers that the Prevent Group wished to acquire are located.  It is in those countries that plaintiffs felt the alleged effects of Project 1.  To the extent plaintiffs contend that the place of injury is Michigan because defendants, through Project 1, prevented them from acquiring other Michigan-based suppliers, the Court finds this argument to be too speculative to merit any substantial weight.

For these reasons, the Court concludes that the public interest factors weigh strongly in favor of this matter being litigated in Germany.

**B. *Private Interest Factors***

The Court must also consider the private interest factors the Supreme Court has identified:

> In *Gulf Oil*, the Supreme Court announced a non-exhaustive list of private interests to consider, including "the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing,

> witnesses; possibility of view of premises, if view would be
> appropriate to the action; and all other practical problems that make
> trial of a case easy, expeditious and inexpensive."

*Jones*, 920 F.3d at 1092 (quoting *Gulf Oil*, 330 U.S. at 508).  Another private interest factor raised

by the Sixth Circuit is whether "documents and witnesses will likely require translation to English."

*Solari*, 654 F. App'x at 768.

Like the public interest factors, the private interest factors weigh heavily in favor of

litigating this matter is Germany.  The case revolves around Project 1, which allegedly was devised

at VWAG's offices in Wolfsburg, Germany, in order to punish the Prevent Group for cutting off

parts supplies in 2016 and to stop the Prevent Group from acquiring other parts suppliers.  The vast

majority of the evidence in this case exists in Germany in the form of VWAG documents and

VWAG personnel.  The complaint alleges that plaintiffs' knowledge of it comes from "internal

Volkswagen documents" supplied by "a senior Volkswagen executive," Compl. ¶ 93 n.5, and

"internal Volkswagen presentations" for and by Volkswagen management.  Compl. ¶¶ 7, 8, 96, 97,

105, 108, and 148-49.  Other evidence, based on plaintiffs' allegations, may exist in Poland and

Brazil.  By contrast, the only Michigan-based evidence suggested by the complaint are two

witnesses, the CEO and CFO of Tower International.

Plainly, the vast bulk of the evidence in this case is in Germany.  This Court would

have great difficulty compelling the production of documents and the testimony of witnesses in

Germany, whereas German courts can do so readily.  *See* Wurmnest Decl. ¶¶ 7, 30-34.  Germany

obviously "provides better access to sources of proof" than does Michigan.  *Solari*, 654 F. App'x

at 768.  Further, if the instant case were to proceed in this Court, all of the German documents and

German witness testimony would have to be translated into English for the benefit of the Court and

its jurors, a fact that weighs in favor of litigating the case in Germany.  *See id.*; *Barak v. Zeff*, No. 06-14424, 2007 WL 1098530, at *4 (E.D. Mich. Apr. 12, 2007) (finding that private interests supported forum non conveniens dismissal in part because "[t]ranslating [relevant Spanish] documents into English . . . would be time-consuming and costly").

For these reasons, the Court concludes that the private interest factors strongly support dismissal of this case on forum non conveniens grounds.

### Plaintiffs' Choice of Forum

The final factor the Court must consider is the degree of deference that should be given to plaintiffs' choice of forum.  As the Supreme Court has noted,

> [a] defendant invoking forum non conveniens ordinarily bears a heavy burden in opposing the plaintiff's chosen forum. When the plaintiff's choice is not its home forum, however, the presumption in the plaintiff's favor applies with less force," for the assumption that the chosen forum is appropriate is in such cases "less reasonable." *Piper Aircraft Co.*, 454 U.S., at 255-256, 102 S.Ct. 252.

*Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430 (2007).  Similarly, the Sixth Circuit has stated:

> Forum non conveniens, as we mentioned, is largely intended to secure convenient trials, and we defer to a plaintiff's choice of forum based on an assumption that the plaintiff will choose a convenient forum.  That assumption is stronger when a plaintiff picks his home forum, so we give greater deference in those circumstances. *Hefferan*, 828 F.3d at 493 (citation omitted).  We likewise defer less to a plaintiff who picks a foreign forum because the assumption is weaker. *Id.*

*Jones,* 920 F.3d at 1094.  A relevant consideration is whether plaintiffs' "decision to file suit in the United States was motived by a legitimate reason such as convenience or the ability to obtain jurisdiction over the defendants rather than tactical advantage." *Hefferan,* 828 F.3d at 494.  "[T]he

20

greater the plaintiff's connection to the United States 'and the more it appears that considerations of convenience favor the conduct of the lawsuit in the United States, the more difficult it will be for the defendant to gain dismissal for forum non conveniens.'" *Id.* (quoting *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 72 (2d Cir.2001) (en banc)).

Plaintiffs' choice of forum in this matter is entitled to little, if any, deference. Neither plaintiff has a strong connection to the United States. Plaintiff Eastern Horizon has no connection. It is a Dutch corporation whose offices are in Amsterdam that is "owned by the Hastor Family within the network of Prevent Group companies and operates as a holding company for newly-acquired Prevent Group operating companies." Compl. ¶ 22. Plaintiff Prevent USA, while incorporated in Pennsylvania, is "a company within the Prevent Group" that was "formed specifically to facilitate potential acquisitions in the United States." *Id.* ¶ 23. Prevent USA appears to be nothing more than a scouting party for the Prevent Group, a cluster of European companies with no operations in the United States. Neither plaintiff has any genuine connection to the United States or to the Eastern District of Michigan.

Plaintiffs' litigation history shows that their decision to sue in the United States has nothing to do with convenience and everything to do with forum shopping. Westlaw queries failed to identify a single lawsuit ever brought in any federal or state court in the United States by Eastern Horizon or Prevent USA. However, Prevent Group companies have brought a number of lawsuits against Volkswagen in Germany, the obviously more convenient and appropriate forum for resolution of their disputes against this German car maker.

This litigation history is worth describing in depth. It demonstrates that the instant lawsuit is merely the latest in a long series of lawsuits in which Prevent Group companies have

claimed in various German courts – without success – that VWAG and its subsidiaries are attempting to put them out of business and/or stop them from acquiring other parts suppliers.

This litigation history is explained in the declaration of Dr. Detlef Hass, ECF 33, submitted in support of defendants' motion.  Dr. Hass catalogues the lawsuits that have been litigated in German courts between Prevent Group companies and Volkswagen since 2016.  The first two were brought by VWAG and some of its subsidiaries against the Prevent Group companies Car Trim GmbH ("Car Trim") and ES Automobilguss GmbH ("Automobilguss") in August 2016 when these suppliers froze all deliveries to Volkswagen.  In each case, the Braunschweig Regional Court found the suppliers' delivery freezes to be unjustified, granted Volkswagen's motions for preliminary injunctions, and ordered the suppliers to resume delivery of parts for specified periods of time.  *See* Hass Decl. ¶¶ 3, 4; Hass Decl. Exs. 1, 2.

A third lawsuit arose in 2018.  In March of that year, Volkswagen informed Automobilguss that it was terminating its supplier contract with that company.  Automobilguss then sued VWAG in the Regional Court of Leipzig and sought an injunction requiring Volkswagen to continue purchasing gear components.  *See* Hass Decl. ¶ 6; Hass Decl. Ex. 3.  The court granted partial relief, but the appellate court, the Higher Regional Court of Dresden, reversed.  Hass Decl. ¶¶ 7-9; Hass Decl. Ex. 4   The appellate court concluded that Volkswagen had good cause to terminate its relationship with Augomobilguss "in reaction to the illegal threat of the [latter]" to stop supplying gear components.  PageID.1022.  The court also rejected plaintiff's antitrust argument that VWAG had abused its market power, finding that "[t]he Plaintiff did not demonstrate by *prima facie* evidence that the Defendant is a market-dominating company."  PageID.1017.

Prevent Group's legal action against Volkswagen continued in another German court

22

in 2018 when Prevent TWB GmbH & Co KG ("TWB") sued VWAG and two other VW subsidiaries

in an effort to require them to continue purchasing its car seat components.  *See* Hass Decl. ¶ 10;

Hass Decl. Ex. 5.  Defendants had given notice in March 2018 that they were cancelling their supply

agreements with TWB effective March 2019.  The Regional Court of Dortmund noted plaintiff's

belief that "the cancellation is simply retribution for the dispute that has been publicized in the

media between [VWAG] and two affiliated companies of Plaintiff's parent company, CarTrim

GmbH and ES Automobilguss GmbH, dating from 2016."  Hass Decl. Ex. 5 (PageID.1073).  The

court denied the injunction.[4]  PageID.1069.  In affirming, the Duesseldorf Higher Regional Court

found plaintiff's request for an injunction to be "unfounded" because, among other reasons, plaintiff

conceded that it had already found more than ten new customers."  Hass Decl. Ex. 6 (PageID.1136,

1141).

      The dispute over VWAG's cancellation of Prevent Group's parts contracts continued

in another German court, the Regional Court of Hanover, where TWB sued Skoda Auto a.s., a

VWAG subsidiary, in 2018.  Hass Decl. ¶ 12.  That court, like the Regional Court of Dortmund (and

---

[4] This court later dismissed the action.  Hass Decl. ¶¶ 14-16, Hass Decl. Ex. 9.  Plaintiff alleged, among other things, that VWAG sought "to completely side-line all supply companies of the Prevent Group, as can be seen from the VW presentation designated 'Project 1.'" PageID.1286.  The court dismissed plaintiff's claims, finding that VWAG had good cause to terminate its supply contracts with TWB due to "the suspension of deliveries by the Prevent Group companies . . . in 2016 and the discontinuation levy [i.e., unilateral price increase] charged by [TWB] in violation of the agreement."  PageID.1296.  The court went on to note that "[t]he suspensions of deliveries implemented by the subsidiary companies Car Trim and ES Guss already by themselves lead to a loss of trust vis-a-vis [TWB], justifying the termination of the present contract . . . [because] [t]he suspensions of deliveries at that time were unlawful."  *Id.* The court also rejected plaintiff's antitrust claim that VWAG and Audi abused their market power.  The court found that TWB failed to show that defendants "are market-dominant companies" in light of the "interchangeability of the products" at issue and plaintiff's demonstrated ability to find other potential customers.  PageID.1299.

for essentially the same reasons), denied plaintiff's request for an injunction to compel defendant to continue buying car seat components after defendant canceled its contract in early 2018.  Hass Decl. Ex. 7.  Plaintiff appealed this decision to the First Antitrust Division of the Celle Higher Regional Court, but withdrew the appeal after that court indicated that it intended to dismiss the appeal because it "clearly has no chance of succeeding."  Hass Decl. ¶ 13, Hass Decl. Ex. 8 (PageID.1247).

Another in this continuing series of disputes between VWAG and Prevent Group is a lawsuit brought by VWAG against Neue Halberg-Guss GmbH ("NHG"), a supplier of engine blocks and other components, in the Regional Court of Braunschweig in 2018.  Hass Decl. ¶ 19, 20; Hass Decl. Exs. 12, 13.  In that case, VWAG obtained an order permitting it to attach NHG's assets in the amount of 42 million Euros. The basis for the claim was that NHG, upon being acquired by the Prevent Group, massively increased the prices it demanded VWAG pay as a condition of continued delivery.  Hass Decl. Exs. 13 (PageID.1633-35).  VWAG paid the demanded prices, which the court characterized as "usurious," in order to avoid production shutdowns at its engine plant.  PageID.1650, 1654.  In affirming, the appellate court agreed that NHG's significant price increases were usurious and that NHG's threatened "delivery stop caused an economic predicament for [VWAG], which at the time was dependent on deliveries from [NHG] because  alternatives were—undisputedly—not available in a timely manner." Hass Decl. Ex. 14 (PageID.1735).

The most recent battle between VWAG and Prevent Group took shape in December 2019, when a company named Andromeda Dispute & Litigation GmbH ("Andromeda") sued VWAG, Audi AG, Porsche AG, Skoda Auto a.s., SEAT S.A., SITECH Sitztechnik GmbH, Volkswagen Automatic Transmission Co. Ltd. No. 125, and Volkswagen R GmbH in the Regional

Court of Frankfurt.  Hass Decl. ¶ 22, Hass Decl. Ex. 15.  Plaintiff indicated that it was suing by

assignment on behalf of several Prevent Group companies[5] whose contracts with the VW companies

had been terminated in March 2018.  Hass Decl. Ex. 15 (PageID.1788).  In this lawsuit, plaintiff

asserts claims "on the basis of contractual and criminal law, and in particular antitrust law" for these

unlawful terminations.  *Id.*  VWAG, plaintiff alleges, "had strategically prepared for this separation

for years."  PageID.1789.  Plaintiff points to a Project 1 presentation in April 2017 for VWAG's

board where the company's "separation costs" were tallied.  *Id.*  VWAG allegedly intended that

"[a]ll suppliers should see what happens when they do not strictly follow the unwritten laws of

[VWAG];  for,  in  2016,  individual companies of the 'Prevent Group' had dared to suspend

delivery."  *Id.*  VWAG allegedly intended "to 'eliminate' all of the companies of the 'Prevent

Group.'"  PageID.1790.  According to the complaint, VWAG believed that "the strategy of the

'Prevent Group' that had been pursued for years – the acquisition and recovery of small and

mid-sized automotive supply companies – had to be halted."  *Id.*  VWAG allegedly

> created a "List of problematic suppliers," which recorded, among
> other things, financial assessments for each supplier, the dependence
> of the supplier on [VWAG] in percentage of revenue, a "depth
> evaluation" for each supplier, the plans of Volkswagen for handling
> the supplier, and, in the column "Status," all information regarding

---

[5] The complaint refers to the assignors of these claims as the "Cedents" and identifies
them, at various places in the complaint, as Prevent DEV GmbH ("Cedent No. 3"), Prevent TWB
GmbH & Co. KG ("Cedent No. 4"), Prevent foamtec GmbH ("Cedent No. 5"), Eybi Austria
GmbH ("Cedent No. 6") (PageID.1787); CarTrim GmbH ("Cedent CarTrim") (PageID.1790);
Eisenwerk Erzgebirge 1566 GmbH ("Cedent No. 2") (PageID.1793-94); Eastern Horizon
("Plaintiff is . . . pursuing claims of the Cedents No. 3) - 6) . . . and Eastern Horizon")
(PageID.1795); and ES Automobilguss GmbH (PageID.1847) (listing companies whose claims
have been assigned to Andromeda).  Dr. Hass indicates that in March 2020, Andromeda
"informed the court that the claims assigned to it by Eastern Horizon had in the meantime
been reassigned back to Eastern Horizon and that the plaintiff therefore withdraws the
complaint with regard to Eastern Horizon's claims."  Hass Decl. ¶ 24.

a change of control. On the other hand, a concept was needed for the replacement of the companies that supplied [VWAG] and its corporation [sic].

\*   \*   \*

Now, with great urgency, replacement suppliers needed to be found for all parts delivered by companies of the "Prevent Group" and – this was planned for "February 2018" – in one fell swoop, all contracts of all companies of the corporation of Defendant No. 1) with companies of the "Prevent Group" were annulled, terminated properly or without notice, and this action was accompanied by a great media presence in order to demonstrate to all suppliers the consequences of "insubordinate behavior."

PageID.1790, 1792.  As evidence, plaintiff references a Project 1 presentation in April 2017 to VWAG's board.  PageID.1792.

The complaint goes on to allege:

The conduct of the Defendants was and is illegal in many respects. In March 2018, there were as few "grounds for termination" for a termination or ending of the contracts without notice or even with notice before the expiry of the fixed term as there were in June 2016.

\*   \*   \*

The concerted action of March 20, 2018, was not only the contractually based but also antitrust-based and moreover illegal infringement of an established and practiced commercial business as well as a malicious, immoral injury to seven Cedents, because, as they have declared, Defendant No. 1) and the remaining affiliates did not pursue any justified economic goals but rather the targeted public injury of the "Prevent Group." Defendant No. 1) lied to the Cedents – as well as to the courts – regarding its actual plans; it was only gradually – some of it very recently – that the duplicitous double-dealing was uncovered.

PageID.1792-93.  Further,

[i]n order to conceal the negative influences on the assets, the stock market price and the share value of Volkswagen AG, the

26

responsible persons involved temporarily named their project "Project-1," more precisely, in the years 2016 and 2017. It is not known what further or other code names the destruction campaign had. In any case, a presentation for the board meeting of the VW Group dated April 25, 2017 (Annex K1) contained a recommendation for action, calling for a complete "modulation" of the "companies of the Prevent Group" (including ES Guss and Car Trim) and for all objectives to be fully implemented by February 2018. . . . Furthermore, the presentation refers to the Group's board meetings dated August 16, 2016 and August 23, 2016, at which the Board of Management of the Group had already decided on the "modulation" - the destruction of all suppliers of the "Prevent Group" and the structure of alternative suppliers.

PageID.1814-15.  The complaint also alleges the specific goals of Project 1:

> In any case, on August 16, 2016, the Board of Management of the [Volkswagen] Group decided to "modulate", i.e. boycott the supplier companies of the Hastor family of entrepreneurs, which were no longer wanted for further business. The Board of Management of the Group determined that
>
> > (1) a fully secured 2-supplier strategy was to be set up to ensure that all VW plants would be supplied with automotive parts without using the companies of the Hastor/Prevent Group;
> >
> > (2) any participation by the Hastor family of entrepreneurs in a supply company in the past, present and future should be examined and prevented;
> >
> > (3) the legal department should be closely involved in all activities relating to the companies of this family of entrepreneurs;
> >
> > (4) close internal monitoring of developments is necessary and that the Board of Management of the Group should report on developments at least weekly (i.e. again on August 23, 2016).
>
> In view of these determinations, it was clear that the Board of Management of the Group did not think of admitting their own mistakes or even of responding to justified demands from VW Group suppliers. It was also clear that the VW Group would use all means

27

made available by the Board of Management to "clean up" all supply chains and supply companies of Hastor managers or Hastor holdings as soon as this appeared necessary for any reason or was deemed necessary as a preventive measure.

PageID.1815.

The complaint further alleges that Project 1, which the complaint also referred to as

"the destruction campaign," included an effort by the VW Group

to use its organizational and structural possibilities in the value-added pyramid for the approximately 11 million vehicles it produces annually to deny the assignors access to new supply contracts for the brands of the VW Group. In addition, the Hastor family and their companies willing to invest were denied access to the supplier market in all markets in which the VW Group was able to exert influence on the award of supplier contracts, namely in South America, *North America*, Europe and Asia. *This included blocking the acquisition of shareholdings in other companies*, although the VW group could not have any equity interest of its own in investing Group funds for this purpose.

PageID.1818 (emphasis added). Project 1 also allegedly sought to block Prevent Group companies

from acquiring other suppliers:

[T]he VW Group has also made every possible effort to exploit its organizational and structuring possibilities in the value-added pyramid for the supply chain controlled by its worldwide in order to prevent companies in which the Hastor family could have had a direct or indirect holding from being taken over.

\*   \*   \*

VW AG, as a listed company, has at no time publicly reported to the capital market that it has been engaged in a campaign of destruction against the companies of the Hastor family of entrepreneurs since at least 2015 and is planning for this dispute both the loss of all deliveries to these companies (and consequently also possible disruptions to assembly at their plants) and costs and claims for damages in the hundreds of millions.

PageID.1844-45.

The complaint asserts antitrust claims, arguing at length that plaintiff had stated a claim under both German and European antitrust law.  PageID.1848 et seq.  Plaintiff alleges that VWAG and the named subsidiaries have monopsony power due to their "dominant position with regard to the vendor parts manufactured by the Prevent companies."  PageID.1850.  Plaintiff asserts that defendant could be held liable under German antitrust law for "any market conduct which has objectively disadvantageous effects on competition for the party concerned."  *Id.*  Within its discussion of defendants' antitrust violations, plaintiff alleges:

> In this context, reference should also be made once again to the strategy of the defendant's group management board to try by all means to prevent the takeover of suppliers by companies of the Prevent Group. All this must be taken into account in the necessary balancing of the interests of the companies concerned. The interest of the defendant is clearly directed towards permanently excluding all companies of the Prevent Group as suppliers for all defendants, because it fears that these companies will build up countervailing power and that it will no longer be able to unilaterally enforce its interests in the drafting of contracts, in particular its general terms and conditions of purchase, and in the execution of contracts, as it has done in the past.

PageID.1854.  Plaintiff further alleges:

> In the present case, as has been explained, it must be assumed that the defendant has a monopoly-like position in the demand for subcontracted parts, which is manifested in the specific form of the supply contracts. Ultimately, the first objective of the defendant regarding 1. [sic] was not only to consolidate its position of power as a buyer of motor vehicle parts, but to expand it and to make it clear to all other suppliers what consequences they would have to expect if they did not comply with the defendant's requirements.

PageID.1857.  The complaint asserts a slew of claims under German law, including antitrust, fraud, unjust enrichment, and interference with an "established . . . business operation."  PageID.1870.  Plaintiff expands on the latter point, citing authority for the proposition that such interference

29

includes "[t]he prevention of planned commercial activities of an already active company . . . , such as its extension or expansion, if the 'internal connection' to an existing company is present." PageID.1871.

This litigation history demonstrates that VWAG and the Prevent Group have been suing each other in German courts for at least the past five years.  In German courts, Prevent Group companies have repeatedly claimed that Volkswagen has committed antitrust violations and business torts by carrying out Project 1.  In the most recent of these cases, the Prevent Group companies' assignee asserts the same claim being asserted in the present case, namely, that Project 1 seeks to prevent the Prevent Group from acquiring other suppliers throughout the world, including in North and South America.  The filing of these many lawsuits is a strong indication that the Prevent Group itself believes that Germany is not only an available and adequate forum for the litigation of these claims, but that it is also the most convenient and logical forum.  This, combined with the fact that plaintiffs have little, if any, connection to Michigan, persuades the Court that their choice of forum deserves little, if any, weight.  Under these circumstances, the private and public interest factors strongly outweigh plaintiffs' choice of forum.

### Conclusion

Having considered all of the relevant factors, the Court concludes that this matter should be dismissed on forum non conveniens grounds.  This case should be litigated in Germany because that is where VWAG allegedly conceived and directed Project 1, the strategy to stop Prevent Group companies, including plaintiffs, from acquiring parts suppliers.  Germany is an available and adequate alternative forum, which Prevent Group companies have used (and are currently using) to litigate its disputes with VWAG.  The public and private interest factors also

weigh strongly in favor of litigating this matter in Germany.  Further, plaintiffs' choice of forum, which is entitled to little deference under the particular facts of this case, does not tilt the balance. Accordingly,

IT IS ORDERED that defendants' motion for dismissal on forum non conveniens grounds [docket entry 31] is granted.

IT IS FURTHER ORDERED that plaintiffs' motion to strike the Nelles declaration [docket entry 45] is denied, as the Court did not consider this declaration.

IT IS FURTHER ORDERED that plaintiffs' motion to lift discovery stay [docket entry 50] is denied as moot.

s/Bernard A. Friedman
BERNARD A. FRIEDMAN
Dated:  March 22, 2021                        SENIOR UNITED STATES DISTRICT JUDGE
         Detroit, Michigan